## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NELSON ESTRADA, ALLEN JOO, TIBA PARSA, TIM REYNOLDS, CRAIG BURSON, individually and on behalf of all others similarly situated, | CASE NO. 1:25-cv-04409-ER **AMENDED COMPLAINT – CLASS ACTION** |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| TASKUS, INC.; DOES 1-10 | |
| Defendant | |

Plaintiffs Nelson Estrada, Allen Joo, Tiba Parsa, Tim Reynolds, and Craig Burson ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, bring this class action against Defendants TaskUs, Inc. ("TaskUs") and other DOES 1-10 and complain and allege upon personal knowledge and information and belief as to all other matters:

### INTRODUCTION

1.    This case concerns one of the largest and most damaging security breaches involving cryptocurrency to date and attempts by Defendant to conceal the scale of its own security failures from customers and the market.  Plaintiffs bring this class action against TaskUs, a business process outsourcing ("BPO") company that provided offshore customer support services to Coinbase, Inc. ("Coinbase"), for its failure to secure and safeguard his and millions of other individuals' personally identifiable information, including names, addresses, phone numbers, email addresses, social security numbers, bank account numbers, bank account identifiers,

government-ID images, and account data (collectively, "PII"). The results of Defendants' failures and subsequent coverup have been catastrophic: Coinbase estimates that its customers have lost up to $400 million to criminals working with—and in some cases, indeed, for—TaskUs. Plaintiffs have, collectively, lost millions of dollars in cryptocurrency assets. Some have lost substantially all of their retirement savings as a result of Defendants' negligence and wrongful conduct.

2.  Moreover, Plaintiffs and other class members have suffered additional injuries and damages. As a result of the theft of their PII, Plaintiffs have been bombarded by daily text messages and phone calls from criminal actors impersonating Coinbase employees to induce Plaintiffs to transfer their assets to accounts belonging to those criminals. Plaintiffs have also suffered from identity theft, loss of value of their PII, out-of-pocket expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the unauthorized access, exfiltration, and subsequent criminal misuse of their sensitive and highly personal information. Plaintiffs are fearful that they may be targeted for physical attacks based on criminals' knowledge of their cryptocurrency holdings.

3.  Defendant TaskUs is a Delaware corporation with its corporate headquarters in New Braunfels, Texas. TaskUs is a BPO, which describes itself as the "outsourcing partner of choice for many of the most disruptive brands in the world."[1] TaskUs provides thousands of outsourced, low-paid employees to perform customer service support for major technology-sector clients.

4.  Coinbase utilizes TaskUs to provide outsourced customer service support from personnel located in India whereby Coinbase compensated Defendant and entrusted it with Plaintiffs' PII and Defendant provided Coinbase and Plaintiffs with outsourced customer service

---

[1] TaskUs, Inc. Form S-1, Registration Statement, at 1, *available at* https://ir.taskus.com/node/6826/ixbrl-viewer.

support from personnel located in India. Coinbase is a multinational publicly traded company operating a cryptocurrency exchange that allows investors to buy, sell, and transfer over 250 cryptocurrencies. Founded in 2012, Coinbase is the largest cryptocurrency exchange in the United States by trading volume, with over 9.7 million monthly transacting users worldwide, 245,000 ecosystem partners, and reported revenue of $6.3 billion in 2024.

5.　　On May 14, 2025, Coinbase publicly disclosed that cyber criminals bribed and recruited a group of allegedly "rogue overseas support agents" to steal Coinbase PII to facilitate social engineering attacks and then tried to extort Coinbase for $20 million to cover up the data theft (the "Data Breach").[2] Coinbase disclosed that a threat actor obtained its customers' PII "by paying multiple contractors or employees working in support roles outside the United States to collect information from internal Coinbase systems..." As set forth in further detail below, those contractors and employees worked for Defendant TaskUs. Coinbase publicly disclosed that it estimated customer losses to be within the range of approximately $180 million to $400 million. Coinbase also disclosed that the breach had affected as many as 1% of Coinbase's 9.7 million monthly active customers.[3]

6.　　Coinbase has publicly acknowledged that those "rogue overseas support agents" worked for TaskUs.[4] Following disclosure of TaskUs' involvement in the Coinbase data breach,

---

[2] Form 8-K, Coinbase Global, Inc. (May 14, 2025).

[3] Protecting Our Customers- Standing Up to Extortionists, *Coinbase Blog,* available at https://www.coinbase.com/blog/protecting-our-customers-standing-up-to-extortionists.

[4] Reuters, *Coinbase Breach Linked to Customer Data Leak in India, Sources Say* (June 2, 205), *available at* https://www.reuters.com/sustainability/boards-policy-regulation/coinbase-breach-linked-customer-data-leak-india-sources-say-2025-06-02/.

a Coinbase spokesperson stated that it "cut ties with the TaskUs personnel involved and other overseas agents, and tightened controls."[5]

7.      TaskUs, for its part, has sought to minimize the extent of its security failures, claiming that "it identified two individuals who illegally accessed information from one of our clients [who] were recruited by a much broader, coordinated criminal campaign against this client that also impacted a number of other providers servicing this client."  TaskUs stated that it "reported this activity to the client, terminated the individuals involved, and are coordinating with law enforcement."[6]

8.      In reality, TaskUs' public statements belie a far broader and coordinated criminal campaign that involved dozens, if not hundreds of TaskUs employees, and stretched into the supervisory level of TaskUs' operations, including TaskUs Operations Managers.  Indeed, TaskUs employed criminal actors who operated a sophisticated scheme and enlisted numerous other employees to assist in their conspiracy to exfiltrate Coinbase's users' data from TaskUs' systems. While TaskUs has publicly claimed that only "two individuals" in TaskUs were involved in the breach, it terminated as many as 300 employees following an internal investigation that it conducted in January of 2025. Nevertheless, TaskUs and Coinbase failed to timely notify Plaintiffs or Class Members of the extent of the breach.  Between January of 2025, when they became aware of the Data Breach and May of 2025, TaskUs and Coinbase disclosed in their Form 10-Ks that they were not aware of any material data breaches impacting their respective companies.  During that intervening period of time, Plaintiff Reynolds suffered a substantial loss of his cryptocurrency

[5] *Id.* ("The person familiar with the matter confirmed that Coinbase was the client and that the incident took place in January.").
[6] New York Law Journal, *Coinbase User Blames Contractor TaskUs for $400 Million Cyberattack* (May 28, 2025), available at https://www.law.com/newyorklawjournal/2025/05/28/coinbase-user-blames-contractor-taskus-for-400-million-cyberattack/.

assets because TaskUs failed to notify him that criminals had bribed TaskUs employees to disclose data that was eventually used to steal his assets.

9.     Instead, TaskUs embarked on a scheme to cover up the true nature and extent of the breach.  TaskUs initially established a team of human resources personnel to investigate the breach and interview the employees involved with criminals at the center of the conspiracy.  However, when those human resources employees uncovered the extent of the data breach and TaskUs' security lapses, TaskUs terminated every employee who participated in the investigation.  Those terminations took place in February 2025, three months before public disclosure of the data breach.  Upon information and belief, TaskUs terminated those employees to conceal the true extent of its security failures.

10.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity protocols necessary to protect PII from the foreseeable threat of a cyberattack and failure to enforce the deficient protocols that they did attempt to implement.  By being entrusted with Plaintiff's and Class Members' PII for its own pecuniary benefit, Defendant assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' PII against unauthorized access and disclosure. Defendant also had a duty to adequately safeguard this PII under applicable law, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act").

11.     Defendant breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII in its possession from unauthorized access and disclosure, and by failing to disclose the breach in a timely manner (and, indeed, concealing the breach) from Coinbase's customers, including Plaintiffs. As a result of

Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs and up to millions of Class Members suffered injury and ascertainable losses in the form of pecuniary damages from the loss of their cryptocurrency assets, out of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from the exposure, the present and imminent threat of fraud and identity theft, and the pecuniary losses and damages resulting from the Data Breach. This action seeks to remedy these failings and their consequences.

12.     Defendant's failure to timely notify the victims of its Data Breach meant that Plaintiffs and Class Members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.  Despite having been accessed and exfiltrated by unauthorized criminal actors as well as criminal actors working directly for Defendant, Plaintiffs' and Class Members' sensitive and confidential PII remains in the possession of Defendant.  Absent additional safeguards and independent review and oversight in the form of injunctive relief, the information remains vulnerable to further cyberattacks and theft.

13.     Defendant disregarded the rights of Plaintiffs and Class Members by, inter alia, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to implement and enforce adequately robust computer systems and security practices to safeguard PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to adequately train and oversee its staff and employees on proper security measures; and failing to provide Plaintiffs and Class Members with prompt and adequate notice of the Data Breach.

14.     In addition, Defendant failed to properly monitor the computer network and systems that housed the PII. Had Defendant properly monitored these electronic systems, they

would have discovered the data breach sooner or prevented it altogether.  The security of Plaintiffs' and Class Members' identities is now at risk because of Defendant's wrongful conduct, as the PII that Defendant collected and maintained is now in the hands of data thieves.  This present harm will continue for the course of their lives.

15.     Armed with the PII accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, converting Plaintiffs' cryptocurrency assets, opening new financial accounts in Class Members' names, taking out loans in their names, using their identities to obtain government benefits, filing fraudulent tax returns using their information, obtaining driver's licenses in Class Members' names, and giving false information to police during an arrest. Data thieves and criminals can also use Plaintiff and Class Members' addresses to initiate physical attacks in order to steal their cryptocurrency assets.  In fact, public reporting indicates that many Coinbase customers have invested in bodyguards to deter kidnappers following the Data Breach and Plaintiffs remain concerned about the potential of physical harm.

16.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a present and imminent risk of fraud, identity theft, and physical attacks.  Coinbase has estimated that losses as a result of stolen cryptocurrency assets from the Data Breach may be as high as $400 million to date.  Other public reports indicate that the Data Breach may subject Class Members to physical harms from criminals using PII including Class Members' personal address in order to steal their cryptocurrency assets.  Among other measures, Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft. Further, Plaintiff and Class Members will incur out-of-pocket costs to purchase adequate credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, change their phone numbers and email addresses, or other protective measures to deter and detect identity theft.

Plaintiff and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. Moreover, because the exposed information includes Social Security numbers (or portions of those numbers) and other immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

17. Plaintiff and Class Members seek to hold Defendant responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of himself and all similarly situated individuals whose PII was accessed and exfiltrated during the Data Breach. Plaintiff, individually and on behalf of all other Class Members, brings claims for negligence, negligent supervision, conversion, fraud (aiding and abetting), breach of implied contract, unjust enrichment, for declaratory and injunctive relief, violation of unfair competition laws, and violation of the California Consumer Privacy Act. To remedy these violations of law, Plaintiff and Class Members seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendant's data security protocols and employee training practices); reasonable attorneys' fees, costs, and expenses incurred in bringing this action; and all other remedies the Court deems just and proper.

## PARTIES

### Plaintiff

18. Plaintiff Nelson Estrada resides in Miami, Florida. He maintains an account with Coinbase in which he stores cryptocurrency assets. On May 15, 2025, he received a notice from Coinbase stating that individuals providing "overseas support" services "improperly accessed information related to [Mr. Estrada's] account."

19. Plaintiff Tiba Parsa resides in California. They maintain an account with Coinbase in which they store cryptocurrency assets. As set forth in further detail below, in and around

October 2024, Parsa was targeted in a sophisticated impersonation attack in which criminal actors utilized information provided to Coinbase to steal a substantial portion of Parsa's retirement savings. On May 15, 2025, they received a notice from Coinbase stating that individuals providing "overseas support" services "improperly accessed information . . . related to [Parsa's] account."

20.     Plaintiff Allen Joo resides in Nevada. They maintain an account with Coinbase in which they store cryptocurrency assets. On May 26, 2025, as set forth in further detail below, Joo was targeted in a sophisticated impersonation attack in which criminal actors utilized information they provided to Coinbase to steal much of Joo's life savings. On May 30, 2025, they received a mailed notice from Coinbase stating that individuals providing "overseas retail support" services "improperly accessed information . . . related to [Joo's] account.

21.     Plaintiff Tim Reynolds resides in Florida. They maintain an account with Coinbase in which they store cryptocurrency assets. As set forth in further detail below, on April 11, 2025, Reynolds was targeted in a sophisticated impersonation attack in which criminal actors utilized information provided to Coinbase to steal a substantial portion of Reynolds' retirement savings. On May 14, 2025, they received a notice from Coinbase stating that individuals providing "overseas retail support" services "improperly accessed information . . . related to [Reynold's] account.

22.     Plaintiff Craig Burson resides in Colorado. They maintain an account with Coinbase in which they store cryptocurrency assets. On May 15, 2025, they received a notice from Coinbase stating that individuals providing "overseas support" services "improperly accessed information related to [Burson's] account."

**Defendant**

23.     Defendant TaskUs, Inc. is a Delaware corporation with its principal place of business in Texas.  TaskUs had access to Coinbase customers' PII and failed to secure the received PII or implement appropriate security measures or screening procedures to ensure that its agents, support representatives, and other individuals to whom Plaintiff and Coinbase entrusted the PII data would ensure secure handling of the data.

24.     Plaintiffs are informed and believe, and thereon alleges, that each of the defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to, and unlawfully caused the damages alleged herein.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

26.     This Court has personal jurisdiction over TaskUs because TaskUs conducts substantial business in New York and in this District; engaged in the conduct at issue herein from and within this District, including by collecting and storing PII provided by Class Members to Coinbase, a company based in New York; and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District, including by collecting and then compromising PII of a substantial number of New York residents.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this District is where a substantial part of the acts, omissions, and events giving rise to Plaintiff's claims occurred.  Specifically, TaskUs acquired Coinbase PII through its relationship with Coinbase, which is based in New York, New York.  TaskUs regularly conducts business in New York related

to Coinbase and a substantial number of Coinbase customers reside in New York, New York, and thus suffered damages as a result of the Data Breach.

<u>**FACTUAL ALLEGATIONS**</u>

**I.    BPO INDUSTRY AND BACKGROUND**

28.    Since approximately 2019, TaskUs, a multi-billion dollar Blackstone-owned BPO, has provided overseas customers support to Coinbase.  BPOs have been around for decades, providing outsourcing services for a range of typically menial tasks such as data entry and customer support.  Companies like Coinbase utilize BPOs to reduce costs and increase flexibility.  By utilizing cheaper labor in foreign countries like India and the Philippines, TaskUs is able to provide services at a fraction of the cost of a company employing the same number of customer support specialists in the United States.  The average salary for an entry level TaskUs employee in India ranges from approximately $4,000 to $6,000 a year, while the United States Bureau of Labor Statistics states that comparable customer support specialists in the United States earn approximately $43,000, or ten times that amount.

29.    Coinbase contracts with Defendant for a variety of customer support services.  For example, when Coinbase customers call the Coinbase customer support hotline for assistance because they have been locked out of their Coinbase accounts or because funds they have transferred do not appear in their Coinbase accounts, they may get routed to a customer service representative employed by TaskUs. In order to assist those customers, TaskUs employees have access to Plaintiffs' PII, including the customers' name, email address, contact information, account data (including transaction logs), and other PII.

30.    Defendant benefits from payments by Coinbase for their respective services, which come from fees Coinbase charges Coinbase's customers, including Plaintiffs.  Upon information and belief, in exchange for those payments, TaskUs agreed to take steps to protect

Plaintiffs and other Coinbase users' data from potential cyber security intrusions.[7]

31.    Recognizing that Coinbase's data was highly sensitive TaskUs implemented certain (largely unenforced and entirely deficient) policies and procedures to protect Coinbase customer data from misuse. For example, TaskUs implemented policies, which were largely unenforced, preventing employees from utilizing cell phones and other personal electronics on premises where TaskUs employees fielded customer services calls for Coinbase customers.

32.    Upon information and belief, however, TaskUs did not implement standard key logging to supervise employees who downloaded or viewed Coinbase's customers' PII in large batches. It's failure to implement such policies, which are standard practice in the BPO industry, set the stage that allowed criminal actors to exfiltrate data belonging to tens of thousands—if not more—customers of Coinbase.

## II.    DATA BREACH

33.    According to personnel knowledgeable of the data breach, in 2024, criminal actors began a campaign of outreach to target and recruit TaskUs employees to join a conspiracy to exfiltrate PII of Coinbase users so that those criminals could steal cryptocurrency assets held by those users. As early as September 2024, TaskUs employee Ashita Mishra joined the conspiracy by agreeing to sell highly sensitive Coinbase user data to those criminals.

34.    According to Reuters, and based on interviews with five former TaskUs employees, TaskUs employees used their personal cell phones to take pictures of their TaskUs computers, which displayed highly sensitive data, including customer contact information,

---

[7] TaskUs' 2024 10-K Annual Report, filed with the Securities and Exchange Commission, that says "the terms of our service contracts typically require that we comply with applicable laws and regulations" including "laws and regulations [that] may involve data privacy and security…. Sometimes our clients require us to take specific steps intended to make it easier for our clients to comply with requirements that are applicable to them."

transaction logs, and account information from Coinbase.[8] The volume of data exposed through the theft was staggering. By the time TaskUs discovered the breach in early January 2025, TaskUs determined that Ms. Mishra's phone contained data belonging to more than 10,000 Coinbase customers. TaskUs determined that Ms. Mishra had operated undetected since at least September 2024. On some days, Ms. Mishra took as many as 200 pictures of Coinbase user data.

35.   Ms. Mishra did not act alone. Instead, according to a TaskUs employee charged with investigating the breach, Ms. Mishra was part of a sophisticated hub-and-spoke conspiracy that funneled Coinbase customer data from TaskUs computers to criminals at the center of the conspiracy. According to that employee, Ms. Mishra and an accomplice operated smaller circles of disconnected TaskUs employees who participated in the conspiracy. Upon information and belief, those employees were not aware that others were also working with Ms. Mishra or her accomplice. As a result, the criminals could continue exfiltrating highly sensitive PII from TaskUs even if one of the spokes in the conspiracy was caught.

36.   According to an employee knowledgeable of the hack, criminals paid TaskUs employees $200 per picture. Upon information and belief, TaskUs employees generated half-a-million dollars or more from bribes paid by criminals to exfiltrate Coinbase users' sensitive PII. Even at the lowest range of that estimate, that amount represents the average annual salaries of more than 100 TaskUs employees—a staggering sum in India.

## III.   TASKUS'S INVESTIGATION AND CONCEALMENT OF THE BREACH

37.   According to individuals knowledgeable of the investigation, on January 1, 2025,

---

[8] Reuters, *Coinbase Breach Linked to Customer Data Leak in India, Sources Say* (June 2, 2025), *available at* https://www.reuters.com/sustainability/boards-policy-regulation/coinbase-breach-linked-customer-data-leak-india-sources-say-2025-06-02/.

TaskUs discovered that at least one employee, Ms. Mishra, possessed a personal electronic device in violation of the (largely unenforced) policy prohibiting such electronic devices on the production floor where TaskUs employees performed services for Coinbase customers. TaskUs secured Ms. Mishra's mobile device and identified a trove of data on her personal device, including hundreds of pictures of Coinbase customer PII. TaskUs also identified encrypted communications on Ms. Mishra's mobile device between herself and criminals discussing the theft of that PII.

38. According to an individual knowledgeable of the investigation, TaskUs then convened a team of human resources personnel to investigate the theft of PII. That team coordinated with the fraud and risk management, audit, and facilities teams, among others, to investigate the breach. It also interviewed Ms. Mishra and other TaskUs employees in communication with Ms. Mishra. TaskUs identified another accomplice of Ms. Mishra who had direct communication with the criminals, and who also accepted bribes in exchange for exfiltration of Coinbase customers' PII. TaskUs investigators also determined that other employees working with both Ms. Mishra and her accomplice participated in the conspiracy.

39. According to at least one former TaskUs employee, the conspiracy had so pervasively infiltrated TaskUs' systems that TaskUs could not identify all of the individuals involved. In particular, TaskUs investigators could not rule out the possibility that other TaskUs employees had been in direct communication with the criminals at the center of the conspiracy. TaskUs also determined that the fraud stretched into the supervisory levels of TaskUs' operations, including to team leaders and operation managers. As a result, TaskUs and its investigators in the human resources department determined to terminate all employees at TaskUs' Indore, India facility and its Guruguram facility, which both provided services to

Coinbase.

40.　In January 2025, TaskUs abruptly terminated 300 employees from their Indore, India-based call center, citing allegations of fraud.[9]　TaskUs has publicly stated that it "immediately reported this activity to the client"—referring to Coinbase.　Those involved in the terminations have also stated that the fraud pertained to TaskUs' provision of support services to Coinbase.

41.　Despite their knowledge of the size and scope of the data breach, neither TaskUs nor Coinbase notified users of the breach in January 2025.　In fact, TaskUs did the opposite.　It concealed its knowledge of the breach from the market.　TaskUs' Form 10-K, filed with the SEC in February 2025, stated that it was not aware of any material data breach impacting the company.

42.　TaskUs also took steps to silence those with knowledge of the breach.　On February 10, 2025, TaskUs suddenly terminated every human resources team member charged with investigating the Coinbase data security breach.　TaskUs has refused to provide those employees with information substantiating the basis for their terminations.

43.　TaskUs' pattern of concealment did not stop there.　Less than one week before Coinbase publicly disclosed the Data Breach to its customers, Blackstone, along with TaskUs' co-founders, executed a buy-out to take TaskUs private at a valuation of $1.62 billion.　TaskUs has not updated its risk factors or otherwise made any material updates to its securities filings to explicitly alert the market to TaskUs' role in the Coinbase data breach.

---

[9] Financial Express, *TaskUs, Indore based BPO Fires Over 300 Employees Without Notice, Sparks Staff Protests,* Jan. 11, 2025, *available at https://www.financialexpress.com/business/industry/taskus-indore-based-bpo-fires-over-300-employees-without-notice-sparks-staff-protests/3712402/.*

## IV.    CRIMINALS USED COINBASE DATA EXFILTRATED BY TASKUS EMPLOYEES TO TARGET COINBASE CUSTOMERS, INCLUDING PLAINTIFFS

44.    Once TaskUs employees exfiltrated sensitive Coinbase user PII to their criminal partners, those criminal partners used the stolen data to impersonate Coinbase employees and persuade victims to transfer their cryptocurrency funds.  The criminals utilized a standard playbook in order to carry out their scheme, successfully stealing as much as $400 million from unsuspecting victims by Coinbase's own estimates.

45.    On October 18, 2024, Plaintiff Parsa received a call from an individual posing as a Coinbase employee.  The individual claimed that Coinbase had detected fraudulent activity on Parsa's account.  The individual identified certain transactions that Plaintiff Parsa had made several weeks prior—information that Parsa believed only Coinbase possessed.  The individual utilized information known only to Coinbase and Defendant, including Parsa's name, their phone number, their email address, and their transaction history on Coinbase, to cause Parsa to open a new Coinbase wallet and transfer their funds to that wallet, which the individual thereafter controlled using information provided by Parsa.  As a result, Parsa suffered significant financial damages, including the loss of their assets held in their Coinbase account. Upon information and belief, the information available to that individual could have come only from Coinbase or their outsourced BPOs, including TaskUs.

46.    On April 12, 2025, Plaintiff Reynolds received a call from an individual posing as a Coinbase employee.  The individual claimed that Coinbase had detected suspicious activity on Reynolds' account.  The individual identified certain transactions that Plaintiff Reynolds had made — information that Reynolds believed only Coinbase possessed.  The individual utilized information known only to Coinbase and Defendant, including Reyolds's name, their phone number, their email address, their transaction history on Coinbase, to cause Reyolds to

create a new Coinbase wallet and transfer their funds to that wallet, which the individual thereafter controlled using information provided by Reynolds. As a result, Reynolds suffered significant financial damages, including the loss of their assets held in their Coinbase account. Upon information and belief, the information available to that individual could have come only from Coinbase or their outsourced BPOs, including TaskUs.

47. On May 14, 2025, Plaintiff Joo received a call from an individual posing as a Coinbase employee. The individual claimed that Coinbase had detected suspicious activity on Joo's account. Joo saved the number as "Coinbase" in their phone. On May 26, 2025, Plaintiff received another call from an individual identified as Coinbase in their caller ID, claiming that an attacker had accessed their Coinbase account. The individual identified certain transactions that Plaintiff Joo had recently made — information that Joo believed only Coinbase possessed. The individual utilized information known only to Coinbase and Defendant, including Joo's name, their phone number, their email address, and their transaction history on Coinbase, to cause Joo to provide access to certain cryptocurrency wallets and devices. As a result, Joo suffered significant financial damages, including the loss of their assets held in their Coinbase account. Upon information and belief, the information available to that individual could have come only from Coinbase or their outsourced BPOs, including TaskUs.

48. Plaintiffs' stories are not unique. Indeed, public reporting indicates that criminals working with TaskUs employees utilized the same or similar social engineering techniques with countless other victims. Coinbase estimates that as much as $400 million has been stolen from customers using data exfiltrated in the Data Breach to date.

49. Plaintiffs have also been targeted for additional attacks and bombarded with calls and texts. Between April 23, 2025, and May 25, 2025, Plaintiff Estrada received nine separate

communications purporting to come from Coinbase indicating that Plaintiff had attempted to login and providing a false number for Mr. Estrada to contact support. Plaintiff Burson has received countless such communications, which have targeted both themselves and their spouse. Burson is also worried that they may be targeted for physical attacks to gain access to their assets, as others have been targeted in the past.

## V.    COINBASE'S DISCLOSURE OF THE BREACH

50.    On May 14, 2025, Coinbase announced that an unnamed threat actor claimed to have obtained Coinbase customers' PII including their names, addresses, phone numbers, email addresses, portions of their social security numbers, account information, bank account information, governmental-ID images, and account data. Defendant did not make similar disclosures even though they were involved in the Data Breach. In a blog post, Coinbase stated that "[c]yber criminals bribed and recruited a group of rogue overseas support agents to steal Coinbase data to facilitate social engineering attacks. These insiders abused their access to customer support systems to steal the account data for a small subset of customers."[10] Coinbase stated that the attackers demanded $20 million to cover up the attack, but that Coinbase refused to pay the ransom. Coinbase's disclosure stated that approximately 70,000 Coinbase users were affected by the Data Breach.

51.    The May 14, 2025, disclosure by Coinbase was flawed and misleading. Namely, neither Coinbase nor TaskUs immediately warned affected customers and instead waited until the Defendant's employees threatened to expose the Data Breach unless Coinbase paid a $20 million ransom. Plaintiff and Class Members are still completely in the dark about the extent of the breach as well.

---

[10] Protecting Our Customers- Standing Up to Extortionists, *Coinbase Blog,* available at https://www.coinbase.com/blog/protecting-our-customers-standing-up-to-extortionists.

52.     Beginning in early May 2025, Coinbase began sending data breach notifications to affected users, including Plaintiffs.  Upon information and belief, Coinbase sent data breach notifications to each of the approximately 70,000 individuals it had referred to in its May 14, 2025, disclosure, and in subsequent disclosures to authorities.

53.     TaskUs and Coinbase were aware of the Data Breach by no later than January of 2025, but Coinbase did not notify Coinbase customers until Coinbase's May 14, 2025, disclosure.  In an interview with Bloomberg News, Coinbase personnel acknowledged that the company began noticing unusual activity from its customer representatives as far back as January, the same time that TaskUs terminated 300 employees at its Indore, India call center.[11]

54.     By January of 2025, TaskUs and Coinbase should have reasonably known the extent and massive scope of the Data Breach and should have promptly informed Coinbase users, including Plaintiffs.  In fact, for months leading up to TaskUs' discovery of the breach, Coinbase had been receiving an increasing number of complaints that individuals posing as Coinbase personnel had caused Coinbase users to transfer funds from their Coinbase accounts.

55.     For example, the FTC publishes data on the top 50 companies receiving consumer complaints each month in the United States.  In the months preceding September 2024, the start of the Data Breach, Coinbase was not among the top 50 companies receiving consumer complaints.  By November 2024, Coinbase had risen to number 48 with 424 monthly complaints.  By December 2024, Coinbase customer complaints to the FTC had risen by more than 50%, from 424 to 634.  By January 2025, Coinbase had risen to number 38 on the list of the most complained-about companies to the FTC, with 664 monthly customer complaints.

---

[11] Bloomberg, *Coinbase Hack Rocks Company That Led Crypto Into Mainstream*, May 15, 2025, *available at* https://www.bloomberg.com/news/articles/2025-05-15/coinbase-says-bribed-workers-leaked-data-to-hacker-seeking-20-million-in-ransom.

Until January 2025, the FTC categorized those complaints as pertaining to "online payment services," but by February 2025, the FTC recategorized those complaints as "business imposters." In other words, even the FTC understood and had raised concerns regarding the growing number of "business imposters" complaints directed towards Coinbase based on publicly available data. Meanwhile, Coinbase and TaskUs (as its customer service contractor) had access to internal customer complaints and thus should reasonably have long been on notice as to the extent of the Data Breach and the number of its customers experiencing losses.

56.     The Data Breach reportedly impacted the PII of nearly 1% of Coinbase's monthly active users. Upon information and belief, Coinbase's disclosure of the number of customers affected by the Data Breach vastly underestimates the number of customers impacted by the Data Breach. In particular, numerous customers, including many who have not received a notification regarding the Data Breach from Coinbase, have inundated public message boards to complain that they have received outreach from individuals posing as Coinbase customer support.

57.     Meanwhile, Binance and Kraken, two other cryptocurrency exchanges that compete with Coinbase, were reportedly able to avoid the same social engineering hacks at issue in the Coinbase Data Breach. In particular, while scammers reportedly reached out to Binance customer-service agents with bribery offers, Binance or its outsourced BPOs utilized artificial intelligence bots to prevent fraud. Upon information and belief, TaskUs did not use similar tools to prevent fraud, nor did they employ other reasonably available and necessary preventative measures.

## VI.     TASKUS FAILED TO FOLLOW FTC GUIDELINES AND INDUSTRY STANDARDS

58.     Federal and state regulators have established security standards and issued

recommendations to prevent data breaches and the resulting harm to consumers and employees. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information. For example, at least 24 states have enacted laws addressing data security practices that require businesses that own, license, or maintain Private Information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

*59.* Defendant is also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

60. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

61. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.

62. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

63. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted

from the system; and have a response plan ready in the event of a breach.

64.     Upon information and belief, Defendant TaskUs took none of these steps.  For example, upon information and belief, TaskUs did not implement measures to monitor whether employees were accessing large number of customers' files.  As a result, TaskUs employees were able to operate for months without detection, scraping large amounts of data regarding Coinbase customers.  Nor did TaskUs utilize

65.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66.     The FTC has brought enforcement actions against businesses, including third-party vendors, for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.     In 2023, the FTC issued another guide for businesses, entitled *Start with Security: Lessons Learned from FTC Cases.*  In that review of decades of FTC enforcement actions against businesses, the FTC warned companies not to collect personal information that they do not need, to restrict access to sensitive data, to limit administrative access, to require secure passwords and authentication, to store sensitive personal information securely and protect it during transmission, to segment a business' network and monitor those trying to

access data, and to secure remote access to a business' network. Notably, the FTC also warned companies to "keep a watchful eye on your service providers" and monitor them for compliance with reasonable security measures.

68. At all times, Defendant failed to properly implement some or all of these (and other) basic data security practices.

69. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

70. Defendant was at all times fully aware of their obligation to protect Coinbase's customers' PII. TaskUs' 2024 10-K, for example, states that "[b]ecause we have access to our clients' sensitive and confidential information in the ordinary course of our business, our employees have engaged and could engage in criminal, fraudulent, or other conduct prohibited by applicable law, client contracts or internal policy."

71. TaskUs has a history of failing to implement appropriate security measures to protect against fraudulent activities by its employees. Its 2024 10-K securities failing acknowledges that: "it is possible that our security controls and practices may not prevent unauthorized or other improper access to our technology, infrastructure, data, equipment, or systems, or the disclosure or misuse of personal, protected health or proprietary information." In 2022, cryptocurrency investors filed a class action complaint against TaskUs related to a similar data breach in which "certain 'rogue' TaskUs employees took advantage of [third-party] customer information" to leak customer information similar to the PII at issue here.[12] According to the complaint, customers lost money in phishing attacks and faced threats of

---

[12] *Forsberg* v. *Shopify, Inc. et al.*, C.A. No. 22-cv-346 (D. Del. Apr. 1, 2022).

physical violence or blackmail if they did not transfer crypto-assets to criminals around the world.

72. Experts routinely identify customer service providers as being particularly vulnerable to cyberattacks because of the value of the PII that these entities collect and maintain.

73. Several industry standards and best practices recommended implementing certain minimum security policies and practices for companies like TaskUs including, but not limited to: educating all employees about cybersecurity; requiring strong passwords; maintaining multi-layer security, such as firewalls and anti-virus and anti-malware software; utilizing encryption (e.g., making data unreadable without a key); utilizing multi-factor authentication; backing up data; and limiting the number of employees with access to sensitive data.

74. Other standard best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

75. Defendant failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

76. These foregoing frameworks are existing and applicable industry standards in the corporate sector and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

77. Defendant's wrongful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber attacks;

b. Failing to heed data security warnings and implement appropriate steps to mitigate the risks related to such warnings;

c. Failing to adequately protect current or former customers' PII;

d. Failing to implement updates and patches in a timely manner;

e. Failing to properly monitor data security systems for existing intrusions, exfiltration of data, brute force attempts, and clearing of event logs;

f. Failing to adequately supervise staff handling PII;

g. Failing to adequately hire and pay staff handling PII;

h. Failing to ensure that all employees and third-parties apply all available and necessary security updates;

i. Failing to ensure that all employees and third parties practice the principle of least privilege and maintain credential hygiene; and failing to avoid the use of domain wide, admin-level service accounts;

j. Failing to enforce its own policies prohibiting the use of personal cell phones;

k. Failing to utilize key logging technology to track its employees' wrongful access to customer PII; and

l. Failing to utilize artificial intelligence to identify employee fraud.

## VII. TASKUS OWED PLAINTIFF AND CLASS MEMBERS A DUTY TO SAFEGUARD THEIR PII

78. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a

duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and Class Members.

79. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including adequately training its employees and others who accessed PII within its computer systems on how to adequately protect PII and adequately supervising its employees to ensure that those who accessed PII did so with an adequate business purpose.

80. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of PII in a timely manner.

81. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

82. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

83. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of inadequate data security practices.

84. TaskUs acknowledged its obligations to Plaintiffs and Class Members in its own securities filings. TaskUs' 2024 10-K, filed with the Securities and Exchange Commission, acknowledges that "third parties may attempt to hold us liable" for "losses or damages resulting from a [cybersecurity] attack." TaskUs' 2024 10-K also recognizes that "we may be subject to claims of liability by our clients *or their customers* based on the misconduct or malfeasance of our employees…" (emphasis added). It further discloses that TaskUs "also strive[s] to comply with applicable industry (including self-regulatory) standards and codes of conduct

relating to privacy and information security and are **subject to the terms of our own privacy policies and privacy-related obligations to third parties**." (emphasis added).

## VIII.    TASKUS KNEW THAT CRIMINALS TARGET PII

85.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

86.    At all relevant times, Defendant knew, or should have known, that Plaintiffs' and all other Class Members' PII was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' PII from cyberattacks that Defendant should have anticipated and guarded against.   In fact, TaskUs' 2024 10-K acknowledges that "[t]here has been an increase in criminal cybersecurity attacks against companies across various industries, where customer and company information has been compromised."

87.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII belonging to Coinbase's customers like Plaintiff and Class Members.

88.    PII is a valuable property right.  The value of PII as a commodity is measurable. "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13]  American companies are estimated to have spent over $19 billion on acquiring

---

[13] OECD (2013), "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value", OECD Digital Economy Papers, No. 220, OECD Publishing. http://dx.doi.org/10.1787/5k486qtxldmq-en

personal data of consumers in 2018.[14]  Personal data is so valuable to identity thieves that once

PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web,"

for many years.

89.     As a result of its real value and the recent large-scale data breaches, identity

thieves and cybercriminals have openly posted credit card numbers, Social Security numbers,

PII, and other sensitive information directly on various websites, making the information

publicly available.  This information from various breaches, including the information exposed

in the Data Breach, can be aggregated and become more valuable to thieves and more damaging

to victims.

90.     Personally identifiable information can be sold at a price ranging from $40 to

$200, and bank details have a price range of $50 to $200 on the black market to thieves who

desire to extort and harass victims, and to take over victims' identities.[15]

91.     Criminals can use stolen PII to extort a financial payment through social

engineering attacks.  For example, armed with just a name and date of birth, a data thief can

solicit additional information from a victim regarding their identity, such as a person's login

credentials or full social security number.

92.     The Data Breach was especially harmful because it exposed non-public details

of users' cryptocurrency accounts – balances, wallet addresses, and recent transaction history.

Possessing that insider information, the attackers could plausibly pose as Exchange personnel

and use various social-engineering tactics to gain control of victims' accounts or divert their

---

[14] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[15] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

assets elsewhere. Consequently, the stolen data commands a high black-market price and enables ongoing schemes that put Plaintiffs and the Class at serious risk of further financial loss.

93. Consumers place a high value on the privacy of that data. According to the Government Accountability Office, "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft . . . . As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harms."[16]

## IX.    THEFT OF PII HAS GRAVE AND LASTING CONSEQUENCES FOR VICTIMS

94. Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[17]

95. Identity thieves use PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or other form of identification, and/or use the victim's information in the event of arrest or court action.[18]

---

[16] GAO Report at 29.
[17] *See What to Know About Identity Theft*, Federal Trade Commission Consumer Advice, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed on Jan. 25, 2024).
[18] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, Experian (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

96.     With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and Social Security number to obtain government benefits, or filing a fraudulent tax return using the victim's information.  In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.

97.     Each year, identity theft causes billions of dollars of losses to victims in the United States.  For example, with the PII stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals  or  undocumented  immigrants,  steal government  benefits,  give  breach victims' names to police during arrests, and many other harmful forms of identity theft.  These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

98.     Personally identifiable information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use the information and trade it on dark web black-markets for years to come.

99.     For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

100.     The PII exposed in this Data Breach is valuable to identity thieves for use in the

kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyberthieves get access to a person's highly sensitive information, they will use it.

101. Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

102. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.

103. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until criminals attempt to utilize such PII in social engineering hacks months, or even years, later. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

104. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.

105. Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.

106. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time, expend the effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other account information for unauthorized activity for years to come.

107. Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including, but not limited to the following:

    a.    Trespass, damage to, and theft of their personal property, including their cryptocurrency assets and their PII;

    b.    Improper disclosure of their PII;

    c.    The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;

    d.    The imminent and certainly impending risk of having their confidential PII used against them by spam callers to defraud them;

    e.    Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

    f.    Loss of privacy suffered as a result of the Data Breach;

    g.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of

the Data Breach;

h.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' PII for which there is a well-established and quantifiable national and international market;

i.  The loss of use of and access to their credit, accounts, and/or funds;

j.  Damage to their credit due to fraudulent use of their PII; and

k.  Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

108.   Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which remains in the possession of Defendant, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards.   Defendant has shown to be incapable of protecting Plaintiff's and Class Members' PII.

## X.   THE DATA BREACH WAS FORESEEABLE AND PREVENTABLE

109.   Given prior accusation that allegedly rogue TaskUs employees compromised customer PII in a similar attack against Shopify, the Data Breach at issue here was both foreseeable and preventable.   Defendant's securities filings disclose the potential of unauthorized access, including intentional misconduct or other malfeasance by Defendant's employees.   For the last several years, TaskUs' securities filings have acknowledged that "we have experienced, and in the future, we may again experience, data security incidents resulting from unauthorized access to or use of our or our service providers' systems and use of our data and our clients' data, including… employee misconduct…"   As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."

110.   Plaintiff and Class Members entrusted their PII to Coinbase, and thus to

Defendant with a reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

111. Plaintiff and Class Members understood and expected that Defendant or anyone in Defendant's position would safeguard their PII against cyberattacks, delete or destroy PII that Defendant was no longer required to maintain, and timely and accurately notify them if their PII was compromised.

## XI. DAMAGES SUSTAINED BY PLAINTIFF AND CLASS MEMBERS

112. Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

113. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have Plaintiffs suffered actual injury from having their PII compromised as a result of the Data Breach including, but not limited to (a) pecuniary losses from the theft of Plaintiffs' and Class Members cryptocurrency assets; (b) misuse of their compromised PII; (c) damage to and diminution in the value of their PII, a form of property that Defendant obtained from Plaintiffs; (d) violation of their privacy, including the compromise of highly sensitive PII; (e) present, imminent and impending injury arising from the increased risk of identity theft and fraud; (f) actual and potential out-of-pocket losses including the loss of time; and (g) emotional distress.

114. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and Class Members.

115. Plaintiff and Class Members have suffered or will suffer actual injury as a direct

result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.    Reviewing and monitoring financial and other sensitive accounts and finding fraudulent transfers, insurance claims, loans, and/or government benefits claims;

    b.    Purchasing credit monitoring and identity theft prevention;

    c.    Placing "freezes" and "alerts" with reporting agencies;

    d.    Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their names;

    e.    Contacting financial institutions and closing or modifying financial accounts; and

    f.    Closely reviewing and monitoring Social Security numbers, insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

    g.    Enhancing the privacy and on-chain anonymity of self-custodied cryptocurrency holdings—e.g., rotating wallet addresses, generating new seed phrases, acquiring additional hardware wallets, and employing privacy-preserving tools—incurring both equipment costs and significant personal time;

    h.    Migrating digital-asset balances to more secure custodial or multi-signature solutions that advertise protections against cyber and physical, and paying the associated account-setup fees, transfer fees, and ongoing service charges; and

    i.    Migrating their contact information to a new phone number or email address that has not been compromised by the Data Breach.

116. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their PII was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place

to adequately safeguard Plaintiff's and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members with prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

117. Plaintiff brings this class action individually and on behalf of all members of the following class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4):

> Nationwide Class
>
> All persons in the United States whose PII was compromised in the Data Breach.

118. Plaintiff proposes the following Subclass definitions, subject to amendment as appropriate:

> California Subclass
>
> All persons in the State of California whose PII was compromised in the Data Breach.
>
> Conversion Subclass
>
> All persons in the United States whose cryptocurrency assets were stolen by those who received PII in the Data Breach.

119. Excluded from the Classes and Subclasses are Defendant and Defendant's subsidiaries, affiliates, officers, directors, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

120. Plaintiffs reserve the right to modify or amend the definition of the proposed Class or Subclasses, including adding additional Subclasses, before the Court determines

whether certification is appropriate.

121. <u>Numerosity:</u> The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Coinbase disclosed that at least 70,000 individuals' PII has been compromised.

122. <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

      a.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

      b.    Whether the computer systems and data security practices employed by Defendant to protect Plaintiff's and Class Members' PII violated the FTC Act, and/or state laws and/or Defendant's other duties discussed herein;

      c.    Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

      d.    Whether Plaintiff and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

      e.    Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

      f.    Whether an implied contract existed between Class Members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Class Members' PII from unauthorized access and disclosure;

      g.    Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and Class Members;

      h.    Whether Defendant's actions and inactions alleged herein constitute gross negligence;

      i.    Whether Defendant breached its duties to protect Plaintiff's and Class

Members' PII; and

j.    Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

123.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

124.    <u>Typicality:</u> Plaintiffs claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had PII compromised in the Data Breach. Plaintiffs Estrada and Burson represent those Plaintiffs whose PII has been compromised in the Data Breach, who receive repeated outreach from persons impersonating Coinbase personnel, but who have not suffered pecuniary losses from the theft of their cryptocurrency. Plaintiffs Parsa, Reynolds, and Joo represent those Class Members whose PII has been compromised in the Data Breach, who receive repeated outreach from persons impersonating Coinbase personnel, and who have suffered pecuniary losses from the theft of their cryptocurrency assets. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

125.    <u>Adequacy:</u> Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class and have no interests adverse to, or in conflict with, the Class that Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

126.    A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

127.　　Adequate notice can be given to Class members directly using information maintained by Defendants or by Coinbase.

128.　　**Predominance**. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Defendant has engaged in a common course of conduct toward Plaintiffs and Class members. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

## COUNT I: NEGLIGENCE

129.　　Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

130.　　Defendant owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

131.　　Defendant knew, or should have known, the risks of collecting and storing Plaintiffs' and Class Members' PII and the importance of maintaining secure systems. Defendant knew, or should have known, of the many data breaches that targeted companies holding significant amounts of PII in recent years.

132.　　Given the nature of Defendant's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

133.　　Defendant breached these duties by failing to exercise reasonable care in

safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiffs' and Class Members' PII. Defendant also breached these duties by failing to enforce its own policies, including those prohibiting the use of personal electronic devices, in the workplace.

134.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' PII to unauthorized individuals.

135.    But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

136.    As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) pecuniary losses from the theft of Plaintiffs' and Class Members cryptocurrency assets (ii) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) improper disclosure of their PII; (iv) breach of the confidentiality of their PII; (v) deprivation of the value of their PII, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of

the Data Breach, including the increased risks of identity theft they face and will continue to face; and (viii) actual or attempted fraud.

## COUNT II: NEGLIGENT HIRING/SUPERVISION

137.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

138.    Defendant owed Plaintiffs and Class Members a duty to exercise reasonable care in the hiring, training, retention, and supervision of its employees, agents, and contractors who were entrusted with access to highly sensitive PII belonging to Plaintiffs and Class Members.

139.    Defendant knew or, in the exercise of reasonable care, should have known that its employees—particularly those in overseas facilities—presented a foreseeable risk of engaging in misconduct, including theft, misuse, and improper disclosure of PII. Indeed, Defendant's own securities filings acknowledged the risk that its employees could engage in criminal or fraudulent conduct with respect to client data.

140.    Defendant breached its duty by negligently hiring, retaining, and supervising employees and contractors who were criminal, unfit, incompetent, or otherwise unable to responsibly handle PII. Defendant failed to conduct reasonable background checks, failed to enforce its policies prohibiting the use of personal devices on production floors, failed to implement adequate monitoring of employee access to customer data, and failed to supervise employees even after becoming aware of misconduct.  Defendant also breached its duties by failing to supervise and oversee their employees, including by implementing appropriate technology to monitor and audit their employees' access to and use of PII.

141.    Defendant further breached its duty by failing to implement and enforce adequate safeguards, oversight mechanisms, and auditing systems that would have prevented,

detected, or deterred the misconduct of its employees and contractors, including the widespread conspiracy to exfiltrate Coinbase customer data.

142.     Defendant knew or should have known that the failure to adequately hire, train, supervise, and discipline its employees and contractors created an unreasonable risk that those individuals would misuse or exfiltrate sensitive PII, thereby causing foreseeable harm to Plaintiffs and Class Members.

143.     As a direct and proximate result of Defendant's negligent hiring, supervision, and retention of its employees and contractors, Plaintiffs and Class Members' PII was accessed, stolen, and misused by criminal actors, causing significant pecuniary losses, emotional distress, loss of privacy, and the ongoing risk of identity theft and fraud.

144.     Plaintiffs and Class Members have suffered actual damages as a result of Defendant's negligence, including but not limited to: (a) loss of cryptocurrency assets; (b) costs associated with mitigating identity theft; (c) loss of value of their PII; (d) time and expenses incurred to monitor and protect against fraud; and (e) emotional distress.

### COUNT III: CONVERSION (RESPONDEAT SUPERIOR)
(Conversion Subclass)

145.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

146.     Plaintiffs and Class Members had a vested property interest in their cryptocurrency assets, which they lawfully possessed and controlled through their Coinbase accounts.

147.     Defendant TaskUs hired, retained, and supervised employees and contractors with direct access to Coinbase customer data necessary to access, secure, and safeguard those cryptocurrency assets.

148.    Defendant's employees, acting in concert with one another and with outside criminal actors, intentionally extracted data necessary to access and then exercise wrongful dominion and control over Plaintiffs' and Class Members' cryptocurrency assets. These employees used their entrusted access to confidential account data to facilitate fraudulent transfers of cryptocurrency from Plaintiffs' accounts into accounts controlled by criminal conspirators.

149.    Defendant is liable for conversion because it hired, retained, and failed to supervise employees who were unfit for positions of trust, and those employees, aided by their positions at TaskUs, assisted in the diversion, exfiltration and misappropriation of cryptocurrency assets belonging to Plaintiffs and Class Members.

150.    Defendant's failure to implement adequate hiring procedures, oversight, or monitoring allowed its employees to operate undetected for months as they funneled Coinbase customer data to criminals who then stole hundreds of millions of dollars in cryptocurrency.

151.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members were deprived of the possession, use, and enjoyment of their cryptocurrency assets, and suffered pecuniary losses, including the complete loss of life savings and retirement accounts in some cases.

152.    Plaintiffs and Class Members are entitled to restitution and damages measured by the value of the cryptocurrency assets wrongfully taken, together with consequential damages flowing from the loss of those assets, in an amount to be proven at trial.

## COUNT IV: FRAUD (AIDING AND ABETTING)
(Conversion Subclass)

153.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

154.     Plaintiffs and Class Members were deceived by criminal actors who, posing as Coinbase representatives, used confidential account data to induce Plaintiffs to transfer their cryptocurrency assets into fraudulent accounts controlled by those criminals.

155.     The fraudulent scheme depended on TaskUs employees providing the criminals with unauthorized access to Coinbase customers' sensitive data, including names, phone numbers, emails, and transaction histories and other PII. Armed with that data, the criminals were able to impersonate Coinbase representatives with apparent legitimacy and defraud Plaintiffs and Class Members out of hundreds of millions of dollars worth of cryptocurrency.

156.     TaskUs' employees knowingly and intentionally assisted and participated in the fraudulent scheme. They sold confidential Coinbase customer data to outside criminals in exchange for bribes, fully aware that such data would be used to defraud Coinbase users.

157.     Defendant TaskUs aided and abetted this fraud by hiring, retaining, and failing to supervise employees with known risks of misconduct, by failing to enforce its own device restrictions and monitoring policies, and by ignoring red flags of widespread theft within its operations, and then taking steps to cover up its knowledge of the Data Breach. TaskUs' willful blindness, combined with its employees' active participation, substantially assisted and encouraged the fraudulent scheme.

158.     TaskUs knew or should have known that its employees were engaged in misconduct. TaskUs terminated approximately 300 employees at its Indore facility in January 2025 for fraud tied to Coinbase support services, demonstrating that the conspiracy was not isolated to a few "rogue agents" but instead pervasive and systemic.

159.     Plaintiffs and Class Members reasonably relied on Coinbase's representations and the integrity of Coinbase's authorized support personnel, which included TaskUs

employees. This reliance was directly undermined by TaskUs' conduct in allowing its employees to aid and abet criminal actors

## COUNT V: BREACH OF IMPLIED CONTRACT

160.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

161.    Defendant required Plaintiff and Class Members to provide, or authorize the transfer of, their PII in order for Defendant to provide services.  In exchange, Defendant entered into implied contracts with Plaintiff and Class Members in which Defendant agreed to comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

162.    Plaintiffs and Class Members conferred a monetary benefit upon TaskUs in the form of monies paid by Coinbase for customer support services and in the form of providing them with PII.

163.    Plaintiffs and Class Members reasonably understood that a portion of the funds paid to Coinbase service providers would be used to pay for adequate cybersecurity measures to protect against their PII.

164.    Plaintiff and Class Members would not have provided their PII to Defendant, or would not have agreed to have that information provided to Defendant, had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

165.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

166.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data

Breach.

167.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members.

## COUNT VI: UNJUST ENRICHMENT

168.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

169.    This claim is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d).

170.    Plaintiffs and Class Members conferred a monetary benefit upon TaskUs in the form of monies paid by Coinbase for customer support services and in the form of providing them with PII.  In particular, Plaintiffs paid transaction fees to Coinbase in order to utilize its exchange, a portion of which Coinbase utilized to compensate TaskUs for its services.

171.    TaskUs also received a monetary benefit from the receipt of Plaintiffs and Class Members' PII in the form of money paid to those involved in the data breach in order to exfiltrate Plaintiffs' and Class Members' PII from TaskUs. Such monetary payments benefitted TaskUs by remunerating TaskUs' employees, reducing attrition rates, and compensating for TaskUs' low salaries for its employees.

172.    Defendant accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Defendant also benefitted from the receipt of Plaintiffs and Class Members' PII.

173.    As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between Coinbase's payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class

Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

174. Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws, and industry standards.

175. Defendant should be compelled to provide for the benefit of Plaintiffs and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT VII: DECLARATORY AND INJUNCTIVE RELIEF

176. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

177. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

178. Defendant owes a duty of care to Plaintiffs and Class Members that require it to adequately secure Plaintiff's and Class Members' PII.

179. Defendant still possesses the PII of Plaintiffs and Class Members.

180. Defendant has not satisfied their obligations and legal duties to Plaintiffs and Class Members.

181. Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that led to such exposure.

182.   There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

183.   Plaintiff, therefore, seeks a declaration (1) that Defendant's existing data security measures do not comply with its duties of care to provide adequate data security, and (2) that to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

   a.   Ordering that Defendant engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   b.   Ordering that Defendant engages third-party security auditors and internal personnel to run automated security monitoring;

   c.   Ordering that Defendant audits, tests, and trains its security personnel and employees regarding any new or modified data security policies and procedures;

   d.   Ordering that Defendant purges, deletes, and destroys, in a reasonably secure manner, any PII not necessary for its provision of services;

   e.   Ordering that Defendant conducts regular database scanning and security checks; and

   f.   Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information

## COUNT VIII: VIOLATION OF UNFAIR AND DECEPTIVE PRACTICES LAW

184.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

185.   Under California's Unfair Competition Law, a person, including a company such as Defendant, is prohibited from engaging in unfair competition, which is defined to "mean and

include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." California Business & Professions Code, sections 17200, et seq. As set forth above (Section VI), Defendant failed to comply with FTC Guidelines and industry standards regarding data safety and security, which failures violate California's unfair competition law.

186.    The consumer protection statutes of the following states are materially identical to California's: Ala. Code § 8-19-5; Alaska Stat. § 45.50.471; A.R.S. § 44-1522(A); A.C.A. §§ 4-88-101, et seq. ; COLO. REV. STAT. § 6-1-102; CONN. GEN. STAT. § 42-110a; DEL. CODE ANN. tit. 6, § 2511; D.C. CODE ANN. § 28-3901; Fla. Stat. §§ 501.201 ; HAW. REV. STAT. § 480-1; IDAHO CODE § 48-603; 815 ILL. COMP. STAT. 510/1 (2024); IOWA CODE § 714.16; KAN. STAT. ANN. § 50-623 (2024); LA. STAT. ANN. § 51:1401 (2024); 10 Me. Rev. Stat. §§ 1212 ; MICH. COMP. LAWS § 445.903; MINN. STAT. § 325F.69; MONT. CODE ANN. § 30-14-101; NEB. REV. STAT. § 59-1601 (2024); NEV. REV. STAT. ANN. § 598.0903 (2024); N.H. REV. STAT. ANN. § 358-A:2 (2024); N.J. REV. STAT. § 56:8-2 (2024); N.M. STAT. ANN. § 57-12-2 (2024); N.Y. GEN. BUS. LAW § 349 (2024); OKLA. STAT. tit. 15, § 751 (2024); S.C. CODE ANN. § 39-5-10; TENN. CODE ANN. § 47-18-104 (2024); VT. STAT. ANN. tit. 9, § 2453 (2024); WASH. REV. CODE § 19.86.010 (2024); WIS. STAT. § 100.18 (2024). Those laws are collectively referred to herein as "UCL."

187.    Defendant engaged in and continues to engage in "unlawful" business acts and practices under the Unfair Competition Law because Defendant took, accessed, intercepted, tracked, collected, or used the Plaintiffs' and Class Members PII or otherwise failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data

security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII. Defendant also breached these duties by failing to supervise and oversee their employees, including by implementing appropriate technology to monitor and audit their employees' access to and use of PII.

188. Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), the FTC Act, 15 U.S.C. § 45, and common law.

189. Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Defendant failed to implement and maintain reasonable security measures to protect Plaintiffs' and Class Members PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security despite knowing the risk of cybersecurity incidents. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Class Members, whose PII has been compromised.

190. Defendant's conduct violates Section 5 of the Federal Trade Commission Act ("FTCA"), Unfair Competition Law in each of the states identified above, the California Consumer Privacy Act, Cal. Civ. Code § 1798.150, and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5

## COUNT IX: VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA) Cal. Civ. Code § 1798.150

### (On behalf of California Subclass)

191.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

192.    The CCPA, Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA. Section 1798.150(a) specifically provides.

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

> (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

> (B) Injunctive or declaratory relief.

> (C) Any other relief the court deems proper.

193.    Defendant is businesses under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners.

194.    Plaintiff PARSA, a resident of California, provided notice to TaskUs of its claim under the CCPA, including an opportunity to cure, on July 29, 2025.  PARSA did not receive a response from TaskUs.

195.    Subclass Members are covered "consumers" under subdivision (g) of § 1798.140 in that they are natural persons who are California residents.

196.    The personal information of Plaintiff and Subclass Members at issue in this lawsuit constitutes "personal information" under subdivision (a) of § 1798.150 and § 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity

attack includes an individual's including names, addresses, phone numbers, email addresses, social security numbers, bank account numbers, bank account identifiers, government-ID images, and account data.

197.    Defendant should have known that their employees engaged in or participated in the Data Breach without Plaintiffs' consent.

198.    Defendant failed to implement or maintain reasonable data security procedures to protect against a potential data breach, by failing to conduct reasonable background checks, failing to enforce its policies prohibiting the use of personal devices on production floors, failing to implement adequate monitoring of employee access to customer data, and failing to supervise employees even after becoming aware of misconduct

199.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Subclass Members were injured and lost money or property, including but not limited to their cryptocurrency assets, the loss of their legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

## <u>PRAYER FOR RELIEF</u>

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

    a.    Certifying the Class as requested herein, designating Plaintiff as class representative, and appointing Plaintiff's counsel as Class Counsel;

    b.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

    c.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, individually and on behalf of the Class, seeks appropriate injunctive relief designed to prevent Defendant

from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft.

    d.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

    e.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

    f.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

200.    Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

September 16, 2025

Respectfully Submitted,

*/s/ Carter E. Greenbaum*

Carter E. Greenbaum
Casey Olbrantz
**GREENBAUM OLBRANTZ LLP**
255 5th Avenue, Suite C221
New York, New York 10019
Tel: 212-732-6837
Email: carter@greenbaumolbrantz.com
Email: casey@greenbaumolbrantz.com

Devin ("Vel") Freedman
Niraj Thakker (*pro hac vice* forthcoming)
**FREEDMAN NORMAND FRIEDLAND LLP**
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Tel: 788-924-2900
Email: Vel@fnf.law

Edward Normand
Joseph Delich
Jordana Haviv
**FREEDMAN NORMAND FRIEDLAND LLP**

155 E. 44th St., Suite 915
New York, NY 10017
Tel: 646-494-2900
Email: tnormand@fnf.law
Email: jdelich@fnf.law
Email : jhaviv@fnf.law