# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NELSON ESTRADA, ALLEN JOO, TIBA PARSA, TIM REYNOLDS, CRAIG BURSON, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-04409-ER |
| Plaintiffs, | |
| v. | |
| TASKUS, INC.; DOES 1-10 | |
| Defendants | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO TASKUS' MOTION TO DISMISS

Carter E. Greenbaum
Casey Olbrantz
**GREENBAUM OLBRANTZ LLP**
255 5th Avenue, Suite C221
New York, New York 10019
Tel: 212-732-6837
Email: carter@greenbaumolbrantz.com
Email: casey@greenbaumolbrantz.com

Edward Normand
Joseph Delich
Jordana Haviv
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th St., Suite 915
New York, NY 10017
Tel: 646-494-2900
Email: tnormand@fnf.law
Email: jdelich@fnf.law
Email: jhaviv@fnf.law

Devin ("Vel") Freedman
Niraj Thakker (*pro hac vice*)
**FREEDMAN NORMAND FRIEDLAND LLP**
1 SE 3rd Ave, Suite 1240
Miami, FL 33131
Tel: 788-924-2900
Email: Vel@fnf.law
Email: nthakker@fnf.law

Tina Wolfson
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
twolfson@ahdootwolfson.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 3

     A.     TaskUs Employed Criminals Who Stole Plaintiffs' PII ....................................... 3

     B.     TaskUs Failed to Implement Standard Protocols to Safeguard Plaintiffs PII ......... 5

     C.     Criminals Use Stolen PII to Convert $400 Million in Cryptocurrency ................. 6

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 7

I.      THE COMPLAINT STATES A CLAIM FOR NEGLIGENCE AND
       NEGLIGENT SUPERVISION. ....................................................................... 7

II.     THE COMPLAINT STATES A CLAIM FOR CONVERSION. .................................... 13

III.    THE COMPLAINT STATES A CLAIM FOR FRAUD. ................................................. 15

IV.    THE COMPLAINT STATES A CLAIM FOR BREACH OF IMPLIED
       CONTRACT. ......................................................................................................... 17

V.     THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT. ................. 18

VI.    THE COMPLAINT STATES A CLAIM FOR UNFAIR COMPETITION. .................. 19

VII.   THE COMPLAINT STATES A CLAIM UNDER THE CCPA. .................................... 21

VIII.  PLAINTIFFS STATE A CLAIM FOR DECLARATORY AND
       INJUNCTIVE RELIEF. ...................................................................................... 22

CONCLUSION .................................................................................................................. 24

# **TABLE OF AUTHORITIES**

## Cases

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009).......................................................................15

*Arango v. Vasquez*,
  89 A.D.3d 875, 933 N.Y.S.2d 82 (2d Dep't 2011) ...................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................7

*Brush v. Miami Beach Healthcare Group Ltd.*,
  238 F. Supp. 3d 1359 (S.D. Fla. 2017) ...................................................................11

*Cooney v. Chicago Public Schools*,
  407 Ill. App. 3d 358, 943 N.E.2d 23 (Ill. App. Ct. 2010).......................................12

*Donnelly v. Elling*,
  85 A.D.3d 847 (2d Dep't 2011) ..............................................................................11

*Flores v. Aon Corp.*,
  2023 Il. App (1st) 230140, 477 Ill. Dec. 110, 242 N.E.3d 340 (Ill. App. Ct. 2023)................12

*Griffey v. Magellan Health Inc.*,
  562 F. Supp. 3d 34 (D. Ariz. 2021) ........................................................................21

*Hamilton v. Beretta U.S.A. Corp.*,
  96 N.Y.2d 222 (N.Y. 2001) ...............................................................................9, 11

*Hammond v. The Bank of New York Mellon Corp.*,
  2010 WL 2643307 (S.D.N.Y. June 25, 2010) ...................................................11, 17

*Hatton v. Quad Realty Corp.*,
  100 A.D.2d 609 (2d Dep't 1984).............................................................................14

*Holmes v. Gary Goldberg & Co., Inc.*,
  40 A.D.3d 1033, 838 N.Y.S.2d 105 (2d Dep't 2007).............................................14

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
  2021 WL 5937742 (D.N.J. Dec. 16, 2021) .......................................................11, 23

*In re Ambry Genetics Data Breach Litig.*,
  567 F. Supp. 3d 1130 (C.D. Cal. 2021) ..................................................................19

*In re Equifax, Inc. Customer Security Breach Litigation*,
  362 F. Supp. 3d 1295 (N.D. Ga. 2019) ...................................................................11

*In re Experian Data Breach Litig.*,
  2016 WL 7973595 (C.D. Cal. Dec. 29, 2016) .........................................................10

*In re GE/CBPS Data Breach Litig.*,
  2021 WL 3406374 (S.D.N.Y. Aug. 4, 2021)...........................................................10

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  2020 WL 6290670 (D. Md. Oct. 27, 2020) ............................................................ 10

*In re Mondelez Data Breach Litig.*,
  No. 23 C 3999, 2024 WL 2817489 (N.D. Ill. 2024)............................................... 12

*In re MOVEit Customer Data Sec. Breach Litig.*,
  23-md-3083-ADB-PGL, 2025 WL 2179475 (D. Mass. July 31, 2025) .................... 11

*In re Propranolol Antitrust Litig.*,
  249 F. Supp. 3d 712 (S.D.N.Y. 2017)..................................................................... 20

*In re Supervalu, Inc.*,
  925 F.3d 955 (8th Cir. 2019) .......................................................................... 12, 18

*In re Warner Music Grp. Data Breach*,
  2025 WL 2531832 (S.D.N.Y. Sept. 3, 2025)........................................................ 7, 8

*Island Associated Coop v. Hartmann*,
  118 A.D.2d 830 (2d Dep't 1986) .......................................................................... 14

*Lazar v. Int'l Shoppes, LLC*,
  2025 U.S. Dist. LEXIS 98054 (E.D.N.Y. May 22, 2025) ......................................... 18

*Leibowitz v. Cornell Univ.*,
  584 F.3d 487 (2d Cir. 2009)................................................................................. 17

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
  83 F. Supp. 3d 501 (S.D.N.Y. 2015)...................................................................... 19

*Maag v. U.S. Bank, Nat'l Ass'n*,
  No. 21-CV-00031-H-LL, 2021 WL 5605278 (S.D. Cal. Apr. 8, 2021) .................... 22

*Quinalty v. FocusIT LLC*,
  2024 WL 342454 (D. Ariz. Jan. 30, 2024) ...................................................... 12, 13

*Rand v. Travelers Indemn. Co.*,
  637 F. Supp. 3d 55 (S.D.N.Y. 2022)...................................................................... 10

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
  893 F. Supp. 285 (S.D.N.Y. 1995)......................................................................... 23

*Robbins v. Banner Indus., Inc.*,
  285 F. Supp. 758 (S.D.N.Y. 1966)......................................................................... 19

*Rosner v. Bank of China*,
  2008 WL 5416380 (S.D.N.Y. Dec. 18 2008), *aff'd* 249 F. App'x 637 (2d Cir. 2009)............ 16

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,
  No. 15 CIV. 6549 (CM), 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018)................... 20

*Shor v Touch-N-Go Farms, Inc.*,
  89 AD3d 830 (2d Dep't 2011) ............................................................................... 8

*Spectre Air Cap., LLC v. WWTAI AirOpCo*,
  737 F. Supp. 3d 195 (S.D.N.Y. 2024)..................................................................... 23

*Toretto v. Donnelley Fin. Sols., Inc.*,
   583 F. Supp. 3d 570 (S.D.N.Y. 2022)..................................................................... 8, 9, 10, 11

*Vangorden v. Second Round, Ltd. P'ship*,
   897 F.3d 433 (2d Cir. 2018)........................................................................................... 7

**Other Authorities**

Cal. Civ. Code § 1798.140(ag)(1)........................................................................................ 21

Fed. R. Civ. P. 8(d)(2).......................................................................................................... 20

## PRELIMINARY STATEMENT

This case arises from one of the most devastating and preventable data breaches in recent history—a breach perpetrated through TaskUs, Inc.'s systemic failure to secure extraordinarily sensitive consumer information entrusted to it by Coinbase for the benefit of Plaintiffs and countless other cryptocurrency holders. As detailed in the Amended Complaint, TaskUs not only provided its offshore customer-support agents with unfettered access to Plaintiffs' personally identifiable information ("PII"), including Social Security numbers, government-ID images, bank account identifiers, and detailed transactional data, but it then allowed widespread, ongoing criminal exfiltration of that information by its own employees. Rather than notify affected consumers or correct its security failures, TaskUs concealed the breach by terminating employees who identified TaskUs' security lapses and publicly representing that no material security incident had occurred—all while its criminal employees and associated criminal actors used the stolen PII to steal more than $400 million in cryptocurrency from Plaintiffs and other Coinbase users.

TaskUs now moves to dismiss Plaintiffs' complaint by minimizing its role in the breach, asserting that it owed no duty to Plaintiffs, and suggesting that it cannot be liable for harms foreseeably caused by its employees' misconduct. Each contention is wrong. The law is clear that a third-party service provider entrusted with consumer PII owes a duty to safeguard that information; that duty applies with full force here, where TaskUs expressly undertook to protect Coinbase customer data and was uniquely positioned to prevent exactly the kind of theft that occurred. Courts applying New York law—particularly in the last decade—have repeatedly rejected the very arguments TaskUs advances, holding that vendors who collect and store sensitive personal information on behalf of others can be liable in negligence, fraud, unjust enrichment, consumer protection statutes, and under the California Consumer Privacy Act (CCPA).

The well-pleaded allegations here easily satisfy the Rule 12(b)(6) standard. As to its negligence claim, Plaintiffs allege that TaskUs employees engaged in a widespread criminal conspiracy to exfiltrate Coinbase user data for their own gain and in order to help steal hundreds of millions of dollars in cryptocurrency assets and that TaskUs owed a duty to protect Plaintiffs data from theft. Plaintiffs also identify specific standard security protocols that TaskUs failed to implement, allowing its employees to operate unfettered, including by taking thousands of photographs of PII displayed on their work computers using their personal cell phones. As to its fraud and other claims, Plaintiffs' complaint alleges that TaskUs knew its employees had engaged in similar criminal activity before, failed to enforce even the most basic security controls, and ignored evidence that employees were funneling PII to criminal actors. Plaintiffs also allege that TaskUs actively concealed the breach, purged internal investigators who uncovered security lapses, and falsely represented to investors and the public that no breach had occurred—all supporting a strong inference of actual knowledge for purposes of Plaintiffs' fraud-based claims.

TaskUs' remaining arguments fare no better. Its contention that it had no relationship with Plaintiffs is irrelevant to the implied-contract and unjust-enrichment claims, which may arise even where an intermediary handles payment or data transfer. Its argument that it is a "service provider" and not a "business" under the CCPA rests on extrinsic factual premises that cannot be resolved at this stage. And its attempt to dismiss Plaintiffs' request for declaratory and injunctive relief ignores that such relief is routinely permitted where, as here, Plaintiffs seek to define the scope of an existing duty and prevent future harm stemming from an ongoing data-security threat.

At bottom, TaskUs asks this Court to disregard well-established data-breach jurisprudence, rewrite the factual allegations in its favor, and affirm the proposition that a company handling the most sensitive financial data in the world has no obligation to protect it. Rule 12(b)(6) does not

permit such a result. Plaintiffs have more than plausibly alleged that TaskUs created an unreasonable and foreseeable risk of catastrophic harm, that its employees repeated misconduct was entirely foreseeable, and that TaskUs' failures directly resulted in hundreds of millions of dollars in losses. The Motion to Dismiss should therefore be denied in its entirety.

## BACKGROUND

TaskUs is responsible for the largest and most damaging security breach involving cryptocurrency of the last several years, resulting in losses of at least $400 million. AC ¶¶ 5-10. TaskUs is a business-process outsourcing ("BPO") vendor that Coinbase, the largest cryptocurrency exchange in the Untied States, relied upon for offshore customer-support operations. *Id.* ¶ 28. TaskUs provided large teams of low-paid support agents in India with access to Coinbase customers' names, addresses, phone numbers, email addresses, Social Security numbers, bank account identifiers, government-ID images, and transactional account data (collectively, "PII"). *Id.* ¶ 1, 29. TaskUs benefitted financially from this arrangement and expressly undertook obligations to protect the PII entrusted to it. *Id.* ¶ 30-32, 84 (TaskUs' 10-K states it complies with "terms of our own privacy policies and privacy-related obligations to third parties"). Plaintiffs are Coinbase customers whose highly sensitive personally identifiable information was compromised in a widespread scheme to funnel such PII to criminals (including TaskUs employees) who then used such information to steal vast amounts of Plaintiffs' cryptocurrency holdings.

### A.    TaskUs Employed Criminals Who Stole Plaintiffs' PII

Beginning in 2024, criminal actors targeted TaskUs employees, bribing them to join a conspiracy to steal Coinbase customer PII by taking photos of such data on company computers using their personal phones. *Id.* ¶ 34. Investigators learned that there was a broader "hub-and-spoke" conspiracy involving multiple TaskUs employees who funneled images from their personal

cellular devices containing stolen PII to criminals for approximately $200 per image—totaling roughly half a million dollars in bribes. *Id.* ¶ 33-36. TaskUs discovered that at least one employee had taken pictures with data belonging to more than 10,000 individual Coinbase customers. *Id.* ¶ 34. On some days, she took as many as 200 pictures of Coinbase user data displayed on her company computer using her personal cellular phone. *Id.* She apparently took those photographs over the course of several months, making it highly implausible that she operated without TaskUs' awareness. *Id.* When TaskUs seized the employee's phone, it identified thousands of pictures of Coinbase customer PII and encrypted messages with criminals discussing the scheme to steal Coinbase user data. *Id.*

The misconduct was so pervasive that TaskUs investigators could not identify all insiders involved, and the scheme reached into team-lead and operations-manager levels. *Id.* ¶ 39-40. While TaskUs claims that "plaintiffs do not suggest that any criminal actors was an employee of TaskUs," (MTD at 3) in fact, the amended complaint includes numerous well-pled allegations that TaskUs employees were part of the criminal enterprise at the heart of this data breach. *Id.* ¶¶ 35, 38, 39, 58.

After uncovering the scheme, TaskUs abruptly terminated 300 employees at its Indore, India facility, which serviced Coinbase. *Id.* ¶ 49. Despite this extraordinary mass termination and the clear evidence of a large-scale breach, neither TaskUs nor Coinbase notified affected customers. *Id.* ¶¶ 41, 52-54. Instead, TaskUs embarked on a plan to cover up the breach. It terminated all of the employees in the human resources department charged with investigating the breach and who identified significant security lapses in TaskUs' processes. *Id.* ¶¶ 41-43. TaskUs then publicly reported in its February 2025 Form 10-K that it was unaware of any material data breaches. *Id.* ¶ 42. One week before the breach was revealed publicly, Blackstone and TaskUs'

founders executed a buyout taking TaskUs private at a $1.62 billion valuation—again without disclosing TaskUs' role in the breach. *Id.* ¶ 43.

TaskUs' attempt to downplay its involvement in the data breach and cover-up the evidence of its negligence has continued throughout this litigation. In particular, TaskUs previously told this Court that Plaintiff's allegations as to TaskUs' involvement in the data breach were "as thin as it gets." ECF No. 31 at 4. Despite enormous and convincing evidence of TaskUs' responsibility for the data breach at the heart of this case, TaskUs previously argued that it is "puzzling that TaskUs is the defendant in this action" and noted that "Estrada is apparently the only plaintiff willing to rely on the unfounded logical leaps necessary to surmise that TaskUs—because it fired some employees months before Coinbase's announcement of the breach—must have been responsible." *Id.* Even now, TaskUs Motion to Dismiss argues that it had no "actual knowledge of the fraudulent activity," MTD at 1, despite the well-pled allegations to the contrary. *Id.* ¶¶ 41-43, 53-55, 86.

### B. TaskUs Failed to Implement Standard Protocols to Safeguard Plaintiffs PII

Despite the sensitivity of the Coinbase data and industry-standard protocols, TaskUs failed to implement or enforce basic security safeguards. *Id.* ¶¶ 13,31, 32, 58-77. These failures included: (i) lack of key-logging or monitoring tools; (ii) inadequate enforcement of rules prohibiting personal cell phones; (iii) failure to monitor for large-scale data exfiltration; and (iv) failure to employ industry-standard cybersecurity measures such as intrusion detection systems, multi-factor authentication, network segmentation, or AI-driven fraud detection. *Id.* ¶ 77. In contrast to TaskUs' failures, two of Coinbase's competitors who utilize artificial intelligence to prevent fraud successfully avoided the same criminal attempts to infiltrate their customer support networks. *Id.* ¶ 57.

TaskUs has a history of failing to implement appropriate security measures to protect against fraudulent activities by its employees. In 2022, cryptocurrency investors filed a class action

against TaskUs related to a similar data breach in which "certain 'rogue' TaskUs employees took advantage of [third party] customer information" to facilitate similar social engineering attacks. *Id.* ¶ 71. TaskUs even warned investors that its employees have engaged in "criminal, fraudulent, or other conduct prohibited by applicable law" in the past. *Id.* ¶ 70. Nevertheless, despite its prior history with similar fraudulent practices, TaskUs did not take appropriate steps to protect Plaintiffs' PII.

### C.    <u>Criminals Use Stolen PII to Convert $400 Million in Cryptocurrency</u>

Using the PII exfiltrated from TaskUs systems, criminals working with TaskUs employees impersonated Coinbase employees and used knowledge of private account details—transactions, balances, email addresses, and phone numbers—to persuade victims to transfer assets to wallets controlled by the attackers. *Id.* ¶¶ 44-49. Those criminals were able to steal $400 million from Coinbase users using data exfiltrated from TaskUs and potentially other BPOs. *Id.* ¶ 48. TaskUs employees, as Coinbase's customer service personnel, are uniquely positioned to pose as Coinbase customer service personnel because their job responsibilities entail just that.

Plaintiffs Parsa and Reynolds received a call from a criminal who cited detailed Coinbase transactions and account information and induced them to transfer retirement savings into a fraudulent wallet. *Id.* ¶¶ 45, 46. Plaintiff Joo received calls spoofed as "Coinbase" using accurate, confidential transaction data and suffered major losses. *Id.* ¶ 47. Each were duped by people posing as Coinbase customer service representatives into transferring their cryptocurrency assets. Together, Parsa, Reynolds, and Joo lost millions of dollars in cryptocurrency assets. *Id.* ¶ 1. Plaintiffs Estrada and Burson received repeated fraudulent login alerts, phishing texts, and spoofed calls derived from compromised PII, and remain at risk of physical targeting due to criminals' knowledge of their crypto holdings and their home address and other contact information. *Id.* ¶ 49.

The stolen PII—much of it immutable, such as Social Security numbers—now circulates among criminal networks, exposing Plaintiffs to ongoing risks of identity theft, financial fraud, cryptocurrency theft, physical targeting, and other long-term harms. *Id.* ¶¶ 95-107, 143. Plaintiffs have lost millions of dollars in cryptocurrency, incurred out-of-pocket mitigation costs, expended substantial time addressing fallout from the breach, and face lifelong heightened risks because their PII remains compromised. *Id.* ¶¶ 94-116.

## LEGAL STANDARD

When assessing Rule 12(b)(6) motions the Court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 437 (2d Cir. 2018) (quotation omitted). A complaint states valid causes of action "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs need only "raise a reasonable expectation that discovery will reveal evidence" supporting their claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

## I.  THE COMPLAINT STATES A CLAIM FOR NEGLIGENCE AND NEGLIGENT SUPERVISION.

Plaintiffs have adequately stated claims for negligence (Count 1) and negligent supervision (Count 2) as a result of TaskUs' failure to secure Plaintiffs' PII and failure to supervise its employees. "To allege a negligence claim under New York law, a plaintiff must plead: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *In re Warner Music Grp. Data Breach*, 2025 WL 2531832, at *11 (S.D.N.Y. Sept. 3, 2025) (quoting *Borley v. United States,* 22 F.4th 75, 78 (2d Cir. 2021). In addition, "[t]o establish a cause of action based on negligent hiring, negligent retention, or

negligent supervision, it must be shown that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Shor v Touch-N-Go Farms, Inc*., 89 AD3d 830, 831 (2d Dep't 2011). Plaintiffs have adequately alleged each element of both claims. *See* AC ¶¶ 58-76 (duty); ¶¶ 33-43; 77 (breach); ¶¶ 44-49 (damages); ¶¶ 85-93, 109-11 (knowledge/foreseeability).

TaskUs contends that the negligence claims must be dismissed because it did not owe a duty to plaintiffs. MTD at 4–5. "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court." *Arango v. Vasquez*, 89 A.D.3d 875, 933 N.Y.S.2d 82, 83 (2d Dep't 2011) (quotation omitted). In the data breach context, courts consider a number of factors when determining whether a party owes a legal duty to safeguard PII, including whether the party "(1) received '[p]laintiffs' personal information while providing its services and stored that information on its servers'; (2) was 'in the best position to protect information on its own servers from data breach'; (3) 'understood the importance of data security to its business, knew it was the target of cyber-attacks, and touted its data security to current and potential customers'; and (4) would not be subject to 'limitless liability,' because its potential liability was 'limited to the individuals whose personal information it obtained while providing its services.'" *In re Warner Music Grp. Data Breach*, 2025 WL 2531832, at *11 (S.D.N.Y. Sept. 3, 2025) (quoting *Toretto v. Donnelley Fin. Sols., Inc*., 583 F. Supp. 3d 570, 594 (S.D.N.Y. 2022) (third party service provider owed a duty of care to protect PII belonging to client's customers)).

Each of these factors, identified in *Toretto*, point in favor of finding that TaskUs owed plaintiffs a duty to safeguard their PII.[1]  TaskUs received Plaintiffs' personal information while

---

[1] *See also Toretto*, 583 F. Supp. at 593 ("A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires

providing customer support services to Coinbase and to them. AC ¶¶ 29, 70, 84. TaskUs was in the best position to protect information because the information was stored on its own servers and accessed by its own employees, who TaskUs were uniquely positioned to supervise. *Id.* ¶ 70 (TaskUs' 10-K acknowledges it has "access to our clients' sensitive and confidential information in the ordinary course of our business"). TaskUs knew it was a target or cyber-attacks and warned investors of the same. *Id.* (TaskUs' 10-K stated that its "employees have engaged and could engage in criminal, fraudulent, or other conduct prohibited by applicable law…"). Moreover, not only was liability to Plaintiffs foreseeable, it was expressly contemplated by TaskUs. *See Id.* ¶ 84 ("TaskUs' 2024 10-K also recognizes that 'we may be subject to claims of liability by our clients **or their customers** based on the misconduct or malfeasance of our employees…'") (emphasis added). TaskUs had even suffered similar data breaches for its cryptocurrency customers and warned investors of the same. *Id.* ¶ 71. Finally, liability is necessarily limited to the individuals whose personal information TaskUs obtained while providing services to Coinbase and its users.

That TaskUs has no direct contractual relationship with Plaintiffs does not change the calculus. The plaintiffs in *Toretto* were individual investors who had no contractual relationship with the defendant, Mediant, a proxy service communication vendor to the financial institution that contracted directly with the *Toretto* plaintiffs. 583 F. Supp. 3d at 581 ("Mediant had received the personal information as part of its business providing investor communication services to financial institutions."). The *Toretto* court nevertheless held that third party service providers owe a duty to secure the PII of their customers' customers like Plaintiffs. Similarly, in *Rand v. Travelers Indem. Co.*, the Southern District of New York held that the defendant, a company that scraped

---

defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.") (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 223 (N.Y. 2001)).

data provided by DMVs to provide car insurance quotes to insurance salespeople, owed a duty to consumers whose data was stolen by cybercriminals even though the consumers had no relationship with the defendant or even authorized them (or the DMVs) to provide the defendant with their data. *See Rand v. Travelers Indemn. Co.*, 637 F. Supp. 3d 55, 70 (S.D.N.Y. 2022) ("[H]olding a discloser of personal information liable for its own negligence under these circumstances fits comfortably into the 'duty equation' articulated by the New York Court of Appeals.").

In fact, courts have routinely and consistently imposed duties on vendors like TaskUs to secure the personal information of consumers—including those with whom such vendors had no direct contractual relationship. *See, e.g.*, *Toretto*, 583 F. Supp. 3d at 594 (collecting cases denying motions to dismiss advanced by third party service providers in the data breach context); *In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *8 (S.D.N.Y. Aug. 4, 2021) (employees of General Electric properly alleged negligence claims against General Electric's document management company); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2020 WL 6290670, at *24 (D. Md. Oct. 27, 2020) (Marriott customers properly alleged negligence claims under the laws of four states against third party data security provider); *In re Experian Data Breach Litig.*, 2016 WL 7973595, at *4 (C.D. Cal. Dec. 29, 2016) (customers of T-Mobile properly alleged negligence claims under New York law against third party data server owner that contracted with T-Mobile).

While TaskUs' motion also argues that it did not specifically undertake "a duty to prevent third-party criminal attacks or to train its employees to do so," the overwhelming weight of contemporary authority imposes a common law duty to "take reasonable precautions due to the reasonably foreseeable risk of danger of a data breach incident." *In re Equifax, Inc. Customer*

*Security Breach Litigation*, 362 F. Supp. 3d 1295, 1321-27 (N.D. Ga. 2019); *Brush v. Miami Beach Healthcare Group Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017) ("It is well-established that entities that collect sensitive, private data from consumers and store that data on their networks have a duty to protect that information."); *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *15 (D.N.J. Dec. 16, 2021) (imposing common law duty to maintain adequate data security practices); *In re MOVEit Customer Data Sec. Breach Litig.*, 23-md-3083-ADB-PGL, 2025 WL 2179475, at *9 (D. Mass. July 31, 2025) ("The VCEs do not dispute that when a defendant collects a plaintiff's PII, the defendant takes on a duty to protect the plaintiffs from foreseeable harm by taking reasonable precautions to safeguard their PII." (citations omitted)).

TaskUs's reliance on the 2010 unpublished decision in *Hammond* to suggest otherwise is misplaced. MTD at 4 (citing *Hammond v. The Bank of New York Mellon Corp.*, 2010 WL 2643307 (S.D.N.Y. June 25, 2010)). As Judge Woods recently observed, "[d]ata breach jurisprudence has developed significantly" since *Hammond* was issued in 2010, and since then "[n]umerous courts applying New York law have denied motions to dismiss negligence claims in data breach cases." *Toretto*, 583 F. Supp. 3d at 594 (S.D.N.Y. 2022) (collecting cases).

TaskUs's authorities for the proposition it cannot be held liable for criminal theft of data are similarly deficient. Critically, two of them have nothing to do with data breaches. *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232-33 (2001) (addressing whether handgun manufacturer owed duty to people killed or injured by illegally obtained handguns); *Donnelly v. Elling*, 85 A.D.3d 847, 848 (2d Dep't 2011) (holding the "plaintiff failed to raise a triable issue of fact as to whether [her ex-boyfriend] assumed a duty of care or created the situation which led to the assault" of plaintiff by her ex-boyfriend's new girlfriend).

Meanwhile, TaskUs's principal authority specific to data breaches—*In re Supervalu, Inc.*, 925 F.3d 955, 963 (8th Cir. 2019)—is not good law. The court in that case was relying on an Illinois Appellate Court decision "that appear[ed] to hold that the state does not recognize a duty in tort to safeguard sensitive personal information." *Id.* (citing *Cooney v. Chicago Public Schools*, 407 Ill. App. 3d 358, 943 N.E.2d 23 (Ill. App. Ct. 2010). The Illinois Appellate Court has since recognized "a duty to maintain reasonable security measures [and that] the reasoning of the *Cooney* court no longer applies." *Flores v. Aon Corp.*, 2023 Il. App (1st) 230140, 477 Ill. Dec. 110, 242 N.E.3d 340, 353 (Ill. App. Ct. 2023); *see also In re Mondelez Data Breach Litig.*, No. 23 C 3999, 2024 WL 2817489 at *4 (N.D. Ill. 2024) ("The Illinois Appellate Court has recently recognized that, based on this [legislative] amendment, 'the reasoning of the *Cooney* court no longer applies.' With the ground thus cut out from under defendants' argument, the Court is in no position to conclude that, as a matter of law, defendants had no duty to safeguard plaintiffs' personal information.") (quoting *Flores*, 242 N.E.3d at 353).

The only other case cited by TaskUs is an unpublished Arizona decision which is readily distinguishable. *See Quinalty v. FocusIT LLC*, 2024 WL 342454 (D. Ariz. Jan. 30, 2024). In *Quinalty*, the court held there was no duty under Arizona law because the defendant had not obtained plaintiffs' information for plaintiffs' benefit. *Id.* at *4 ("Plaintiffs do not allege, however, that Defendant obtained PII directly from Plaintiffs, or for Plaintiffs' benefit. Therefore, a duty does not arise based solely on Defendant obtaining Plaintiffs' PII from financial institutions."). That is obviously not the case here, where TaskUs obtained Plaintiffs' information for the purpose of providing Plaintiffs customer service support. *Quinalty* also held that the FTC Act could not be the source of a duty because the plaintiffs had not alleged "facts explaining how or why Defendant's data security practices were unfair or deceptive." *Id.* Again, there are ample such

allegations in this case. *See, e.g.*, AC ¶¶ 184–90. But more to the point, *Quinalty* is a clear outlier with significant authority, discussed above, to the contrary.

Plaintiffs have adequately alleged that TaskUs owed them a duty to safeguard their highly sensitive PII, and thus have stated causes of action for negligence and negligent supervision.

## II.    THE COMPLAINT STATES A CLAIM FOR CONVERSION.

The Amended Complaint also states a claim for conversion premised on a respondeat superior theory and the use of PII to steal cryptocurrency assets. *See* AC ¶¶ 145–52.

TaskUs first argues that Plaintiffs failed to allege any TaskUs employee ever had "dominion" over their property. MTD at 6. But the Amended Complaint expressly alleges that "Defendant's employees, acting in concert with one another and with outside criminal actors, intentionally extracted data necessary to access and then exercise wrongful dominion and control over Plaintiffs' and Class Members' cryptocurrency assets." AC ¶ 148. In addition, the Complaint repeatedly alleges that TaskUs employees received bribes totaling as much as half-a-million dollars, which were undoubtedly paid out of funds stolen from Plaintiffs and other Coinbase users. *Id.* ¶ 36. It is also telling that criminals posed as Coinbase customer support personnel—the very job that criminal TaskUs employees undertook for TaskUs—in order to induce Plaintiffs and class members to transfer their cryptocurrency assets. At this pre-discovery stage, the Court may reasonably infer that TaskUs employees were not only part of a criminal conspiracy to exfiltrate data, but also part of the criminal conspiracy to steal Plaintiffs and class members crypto assets. Thus, TaskUs is simply wrong when it argues there are no allegations its employees exercised dominion over Plaintiffs' cryptocurrency assets.

TaskUs next argues that it cannot be held liable for its employees' fraudulent activities because those activities were not "within the scope of [their] employment." MTD at 6. However, "[a]s a general rule, a principal is liable for conversion by his agent . . . the Court of Appeals has

held that the principal will be liable where 'the general type of conduct may have been reasonably expected.'" *Hatton v. Quad Realty Corp.*, 100 A.D.2d 609, 610 (2d Dep't 1984) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304, 391 N.E.2d 1278 (1979)). As the Second Department held in *Hatton,* "the key is foreseeability of tortious conduct by the agent." *Id.* Here, Plaintiffs' Amended Complaint includes numerous allegations as to the foreseeability of TaskUs' employees' actions. *See e.g.* AC ⁋ 85-93. For example, TaskUs warned investors about the risk that its employees may engage in criminal activity. *Id.* In addition, TaskUs suffered a nearly identical breach involving the theft of cryptocurrency using PII stolen by its employees just two years prior to the breach at issue in this litigation. *Id.* Given that TaskUs employees' job responsibilities include holding themselves out as Coinbase support personnel and that they have access to information about users' transactions and crypto holdings, "it is certainly foreseeable that an agent entrusted with significant sums of money might convert such funds to his own use." *Hatton*, 100 A.D.2d at 610.

In *Holmes v. Gary Goldberg & Co, Inc.*, TaskUs' own cited authority, the Second Department reversed the dismissal of a conversion claim against an employer of a financial advisor who stole client funds. *See Holmes v. Gary Goldberg & Co., Inc*., 40 A.D.3d 1033, 1034, 838 N.Y.S.2d 105, 106 (2d Dep't 2007). In that case, the Appellate Division held "those acts which the employer could reasonably have foreseen are within the scope of the employment and thus give rise to liability under the doctrine of respondeat superior, even where those acts constitute an intentional tort or a crime." *Id.* (internal citations omitted). Despite curiously citing to *Holmes,* TaskUs makes no attempt to argue that its employees' actions were not foreseeable.

TaskUs' citation to *Island Associated Coop* misses the mark. *See* MTD at 6 (citing *Island Associated Coop v. Hartmann*, 118 A.D.2d 830 (2d Dep't 1986). There, the Second Department dismissed a conversion claim based on a theory of respondeat superior where "[t]he plaintiff

14

presented no evidence to support its second cause of action that the defendant Fram had any knowledge of Hartmann's [the employee's] actions." *Id.* Those facts stand in stark contrast to the well-pled allegations of TaskUs' knowledge and the foreseeability of its employees' misconduct here. Tellingly, that decision involved a motion for summary judgment, after an opportunity for discovery on the issue of the foreseeability of the employee's actions. Indeed, given the foreseeability of TaskUs' employees' malfeasance, dismissal at this stage is not appropriate.

## III.    THE COMPLAINT STATES A CLAIM FOR FRAUD.

TaskUs argues that Plaintiffs' fraud claim must be dismissed because—according to TaskUs—it lacked actual knowledge of its employees' fraud. TaskUs' argument attempts to rewrite the allegations in the Amended Complaint and asks this Court to, once again, take TaskUs' word for it as to what it knew. Regardless, a Plaintiff is not required to expressly plead actual knowledge to survive a motion to dismiss. A plaintiff "can plead facts which give rise to a strong inference that the defendant had knowledge of the fraud" and this "inference 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 314 (S.D.N.Y. 2009) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)) The Second Circuit "does not require the plaintiff to plead actual knowledge on the part of a defendant; if a party pleads facts leading to a 'substantial inference' that will be enough." *Id.* To put a finer point on this, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). Courts "apply the more general standard to scienter for the simple reason that 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Id.* (quoting *Wight v.*

*BankAmerica Corp.*, 219 F.3d 79, 91–92 (2d Cir. 2000) and *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).

And here, the Amended Complaint includes allegations sufficient for a substantial inference of actual knowledge of the primary fraud—the theft of cryptocurrency. After all, TaskUs provided customer services to Coinbase customers, including presumably by assisting customers with claims of cryptocurrency theft. Given that the FTC had identified fraudulent activity involving criminals impersonating Coinbase customer support agents based on complaints to the FTC months before Coinbase's public disclosure, TaskUs, as Coinbase's customer service agent, must have known of the scheme as well. The breach itself involved employees taking pictures of tens of thousands of Coinbase customers' PII using their personal cell phones. It is inconceivable that TaskUs could not have known of such a widespread fraud taking place over the prolonged period of time necessary to amass that data using the rudimentary means employed by TaskUs employees.

Plaintiffs have also made specific allegations that TaskUs took "steps to cover up its knowledge of the Data Breach" and that "it knew or should have known that its employees were engaged in misconduct." AC ¶¶ 157–58; *see also id.* ¶ 43 (TaskUs failed to disclose the breach in May 2025, when it was taken private by Blackstone). Even TaskUs' own cases acknowledge that a defendant may be held liable for fraud if it "helps conceal" the fraud. *Rosner v. Bank of China*, 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18 2008), *aff'd* 249 F. App'x 637 (2d Cir. 2009).

TaskUs has repeatedly attempted to downplay its role in the data breach at the center of this litigation, including by telling this Court that the allegations against it are "as thin as it gets" and claiming that Estrada is the only plaintiff "willing to make the unfounded logical leaps" necessary to identify TaskUs as a responsible party. Since then extensive and shocking factual

evidence have come to light—even before discovery—establishing TaskUs' involvement. Given that history, this Court should not dismiss claims against TaskUs prior to an opportunity to take further discovery as to its knowledge of fraud.

## IV.    THE COMPLAINT STATES A CLAIM FOR BREACH OF IMPLIED CONTRACT.

The Amended Complaint also includes a claim for breach of implied contract based on the provision of PII and payments to TaskUs in exchange for Coinbase customer support services. AC ¶¶ 160–67. "A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506-07 (2d Cir. 2009) (citations omitted). Here, Plaintiffs have adequately alleged that TaskUs required Plaintiffs to provide or authorize the transfer of their PII in exchange for TaskUs' customer support services and that in exchange for payments to Coinbase (and thus to TaskUs) Plaintiffs expected Coinbase and its customer support specialists to protect their data. AC ¶ 162, 163.

TaskUs moves to dismiss, arguing that the parties cannot have had a meeting of the minds where they have "no relationship." In making that argument, TaskUs ignores that its employees likely spoke with Plaintiffs each time they called Coinbase's customer service help line and that Plaintiffs provided their PII to TaskUs and to Coinbase with the expectation that TaskUs would keep their PII secure. TaskUs' relies on the outdated *Hammond* decision to support its argument in that regard, but as explained above, *Hammond* is no longer good law.

TaskUs next argues that Plaintiffs have failed to identify a source for the alleged terms of their implied contract. MTD at 7–8. But the terms of an implied contract can be inferred from the parties' conduct. Here, Plaintiffs handed over their funds and PII with the expectation that reasonable measures would be taken to safeguard that data. *See Lazar v. Int'l Shoppes, LLC*, 2025

U.S. Dist. LEXIS 98054, at *9 (E.D.N.Y. May 22, 2025) ("Employees and customers were required to provide their PII and PHI to defendants in exchange for employment, products, or services and 'reasonably understood that a portion of the funds they paid . . . would be used to pay for adequate cybersecurity measures.'"). And contrary to TaskUs' arguments, it concededly knew that it was expected to safeguard that data in exchange for Coinbase's payments. For example, its 10K disclosed that TaskUs "also strive[s] to comply with applicable industry (including self-regulatory) standards and codes of conduct relating to privacy and information security and are subject to the terms of our own privacy policies and privacy-related obligations to third parties." AC ¶ 84. That same 10-K disclosure (and others) defeat TaskUs' argument that no source of alleged terms is identified. As Plaintiffs have adequately identified both the terms of the implied contract and evidence that TaskUs understood its obligations, they have stated a claim for breach of implied contract.

## V.    THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT.

In support of their unjust enrichment claim, Plaintiffs allege that they conferred benefits on TaskUs in two ways: (1) via fees paid to Coinbase that were then used to pay TaskUs for its services, and (2) via the bribes paid to TaskUs employees. AC ¶¶ 168–75.

TaskUs once again cites to the abrogated *SuperValu* decision, this time to argue that the unjust enrichment claim must be dismissed because the payments were not for data security services. MTD at 8 (citing *In re SuperValu, Inc.*, 925 F.3d at 966). But in *SuperValu*, the plaintiff had purchased groceries with credit cards, and the court reasoned that he "paid for groceries, the price of which would have been the same whether he paid with cash or a credit card" and "[h]e did not pay a premium for a side order of data security and protection." 925 F.3d at 966 (citation omitted).

It is hard to imagine something more different from a grocery store than a cryptocurrency financial services firm like Coinbase, where customers not only expect but count on a portion of revenue to be used to safeguard personal information. *See, e.g., In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1145 (C.D. Cal. 2021) (unjust enrichment claim survived motion to dismiss where "Plaintiffs allege[d] that they paid Defendants money for Defendants' services, and expected that a portion of their payments would go toward 'data management and security.'").

And TaskUs's argument that the unjust enrichment claim is duplicative ignores that (1) it is decidedly not duplicative of the negligence claims, which do not seek to recover for payments to TaskUs, and (2) further ignores that Plaintiffs are entitled to plead unjust enrichment in the alternative to the breach of implied contract claim. *See, e.g.*, *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) ("Such a claim may be pled as an alternative to a breach of contract claim.").

## VI.    THE COMPLAINT STATES A CLAIM FOR UNFAIR COMPETITION.

The Amended Complaint also includes a count for violations of various state consumer protection statutes. AC ¶¶ 184–90. TaskUs takes issue with this, first complaining that it somehow does not comply with notice pleading requirements. MTD at 9.

*Robbins* does not support dismissal. The sentence defendants quote addressed a complaint that blended multiple unrelated securities-law causes of action into an indistinct narrative, leaving the court unable to discern what claims were being asserted and prompting it to emphasize the need to give "at least a fair idea of what the plaintiff complains." *Robbins v. Banner Indus., Inc*., 285 F. Supp. 758, 760 (S.D.N.Y. 1966). Plaintiffs' unfair competition claim does the opposite: it pleads one unfair-and-deceptive-practices claim arising from a uniform, detailed factual scheme and supported by consumer-protection statutes that Plaintiffs expressly allege are materially

identical. Those statutes therefore operate as alternative statements of the same claim, which Fed. R. Civ. P. 8(d)(2) permits to be presented "in a single count."

TaskUs is simply wrong about there being a pleading deficiency. For efficiency purposes, plaintiffs regularly plead equivalent claims under different state statutes as a single count, and courts regularly find them sufficiently pled. *E.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15 CIV. 6549 (CM), 2018 WL 7197233, at *35 (S.D.N.Y. Dec. 26, 2018) (rejecting identical argument); *see also In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017) (rejecting argument that complaint failed to specify state law for unjust enrichment claims) ("Moreover, defendants have made no showing that any differences in the various state laws are material at this early stage of the litigation."); *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016) ("Multi-state class claims should not be dismissed if it is possible that the plaintiffs could demonstrate a manageable grouping of the state laws.").

TaskUs also argues that the Amended Complaint fails to identify the specific statutory elements of the alleged violations that underpin the claims. MTD at 9–10. Again, this simply overstates the requirements of notice pleading. Plaintiff "is not required to identify the particular sections of the code under which the claims are brought, as long as defendants are on notice of the theory plaintiffs are pursuing." *Actavis*, 2018 WL 7197233 at *35 (denying motion to dismiss state consumer protection claims). In any event, Plaintiffs have pled "with reasonable particularity the facts" supporting a violation. Specifically, Plaintiffs pled that TaskUs violated various statutes by failing to take reasonable data security measures and failing to timely notify Plaintiffs about the breach. *See, e.g.*, AC ¶ 188 ("Defendant has engaged in 'unlawful' business practices by violating multiple laws, including California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5

(requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), the FTC Act, 15 U.S.C. § 45, and common law.").

## VII.    THE COMPLAINT STATES A CLAIM UNDER THE CCPA.

TaskUs also moves to dismiss Plaintiffs' claims for violations of the California Consumer Privacy Act (CCPA). TaskUs argues that dismissal is required because it is a "service provider" and not a "business" for purposes of the CCPA, as well as because Plaintiffs allegations are too conclusory. MTD at 10–11.

TaskUs's statutory argument requires the Court to "take its word for it" in a way that is not acceptable at the motion to dismiss stage. Plaintiff expressly alleges that TaskUs satisfies the relevant statutory definition of business. AC ¶ 193. TaskUs attempts to avoid this by (1) suggesting that it does not "determine[] the purposes and means of the processing of consumers' personal information," (part of the statutory definition) and (2) suggesting that it will instead satisfy the statutory requirements to be considered a service provider. Both of these present fact issues that cannot be resolved at this stage. Indeed, the "service provider" definition requires that there is not only a contract between Coinbase and TaskUs for the data sharing, but that the contract expressly including certain restrictions on the use of that data. Cal. Civ. Code § 1798.140(ag)(1).

There is no Coinbase-TaskUs contract in evidence yet, and TaskUs cannot ask this Court to take its word that it not only exists but that the contract will satisfy the CCPA requirements for treating TaskUs as a service provider instead of a business.

TaskUs's other argument that the Amended Complaint is too conclusory is not serious. Plaintiffs allege in detail how the data breach occurred and why TaskUs is at fault for it. The two cases cited by TaskUs are distinguishable in numerous ways, but most significantly, they simply did not involve specific allegations about data protection systems. *Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 57 (D. Ariz. 2021) (dismissing CCPA claim where the only evidence of

deficient systems was the fact of the breach itself) ("Instead, Ranson relies on the same conclusory allegations found elsewhere in the Amended Complaint. That is, because there was a breach, Magellan's data security was inadequate."); *Maag v. U.S. Bank, Nat'l Ass'n*, No. 21-CV-00031-H-LL, 2021 WL 5605278, at *2 (S.D. Cal. Apr. 8, 2021) ("Here, Plaintiff fails to allege any facts to support the notion that Defendant's security was deficient.").

In contrast, at minimum, Plaintiffs have alleged that (1) TaskUs knew it needed to enact data security policies like restricting personal cell phones in workspaces, (2) despite enacting such policies, TaskUs failed to enforce them rendering their system deficient, (3) TaskUs employees exploited these deficiencies to steal personal data in a way that was expressly anticipated by TaskUs, i.e. using personal phones to photograph it. *E.g.* AC ¶ 87 ("TaskUs discovered that at least one employee, Ms. Mishra, possessed a personal electronic device in violation of the (largely unenforced) policy prohibiting such electronic devices on the production floor where TaskUs employees performed services for Coinbase customers. TaskUs secured Ms. Mishra's mobile device and identified a trove of data on her personal device, including hundreds of pictures of Coinbase customer PII."). And if that was not enough (it is), there is also the lengthy section in the Amended Complaint titled "TASKUS FAILED TO FOLLOW FTC GUIDELINES AND INDUSTRY STANDARDS," which goes into considerable detail about what TaskUs should have done, but did not. *Id.* ¶¶ 58–77. To take just one more example, TaskUs failed to implement key logging for its employees. *Id.* ¶ 77.

In short, there is nothing "conclusory" about these allegations.

## VIII.    PLAINTIFFS STATE A CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF.

Finally, in a footnote TaskUs also asks this Court to dismiss Plaintiffs' claim for declaratory and injunctive relief. MTD at 11 n.2. TaskUs's motion should be denied.

Plaintiffs bring the claim for declaratory and injunctive relief under the Federal Declaratory Judgment Act. *See* AC ¶ 177. Plaintiffs do not seek to derive any substantive rights from the DJA and thus do not disagree with Defendant that the DJA "does not create an independent cause of action." MTD at 11 (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012)). Plaintiffs are just seeking a declaration delineating TaskUs's specific obligations under its existing duty of care, which is squarely within the ambit of the DJA.

Even apart from the DJA, a pleadings-based dismissal of claims for declaratory and injunctive relief would be inappropriate here. *See, e.g., In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1151 (C.D. Cal. 2021) (denying motion to dismiss "Plaintiffs' final claim in their SAC [] for 'Injunctive and Declaratory Relief'" for failing to show that they lack an adequate remedy at law). That is why even in the cases cited by TaskUs the analysis does not simply end because an "injunction" is not a standalone cause of action. Rather the Court must consider the nature of the wrongful conduct alleged—here it would be negligence—and then assess whether there are sufficient facts pled to support injunctive relief. *Cf. Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) (dismissing claim for injunctive relief because there was no showing of irreparable harm and requested injunction was overly broad).[2] At this early stage, it is not possible for the Court to determine as a matter of law that injunctive relief will not be appropriate in this case.

---

[2] The other case cited by TaskUs simply dismissed a "claim" for an injunction while making clear that the requested injunction may still be available as a remedy for the surviving claims. *Spectre Air Cap., LLC v. WWTAI AirOpCo*, 737 F. Supp. 3d 195, 211 (S.D.N.Y. 2024). In other words, the *Spectre* court did not really dismiss the claim for injunctive relief at all, it simply combined it with the other claims.

## CONCLUSION

For the above reasons, Defendant's motion to dismiss should be denied. To the extent the Court grants any part of the motion, it should be without prejudice to amendment.


Dated: December 4, 2025                    Respectfully Submitted,

                                           */s/ Carter E. Greenbaum*
                                           Carter E. Greenbaum
                                           Casey Olbrantz
                                           **GREENBAUM OLBRANTZ LLP**
                                           255 5th Avenue, Suite C221
                                           New York, New York 10019
                                           Tel: 212-732-6837
                                           Email: carter@greenbaumolbrantz.com
                                           Email: casey@greenbaumolbrantz.com

                                           Devin ("Vel") Freedman
                                           Niraj Thakker (pro hac vice forthcoming)
                                           **FREEDMAN NORMAND FRIEDLAND LLP**
                                           1 SE 3rd Ave, Suite 1240
                                           Miami, FL 33131
                                           Tel: 788-924-2900
                                           Email: Vel@fnf.law
                                           Email: nthakker@fnf.law

                                           Edward Normand
                                           Joseph Delich
                                           Jordana Haviv
                                           **FREEDMAN NORMAND FRIEDLAND LLP**
                                           155 E. 44th St., Suite 915
                                           New York, NY 10017
                                           Tel: 646-494-2900
                                           Email: tnormand@fnf.law
                                           Email: jdelich@fnf.law
                                           Email: jhaviv@fnf.law

                                           Tina Wolfson
                                           **AHDOOT & WOLFSON, PC**
                                           2600 West Olive Avenue, Suite 500
                                           Burbank, CA 91505
                                           Tel: (310) 474-9111
                                           twolfson@ahdootwolfson.com

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that the foregoing brief complies with the word count limitation set forth in Local Civil Rule 7.1(c) of the Southern District of New York. The brief contains 7,475 words, excluding the caption, table of contents, table of authorities, signature block, and any certificate of compliance. This count was determined by the word-processing system used to prepare this document.

Dated: December 3, 2025

Respectfully submitted,

/s/ *Carter E. Greenbaum*
Carter E. Greenbaum
