UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NELSON ESTRADA, ALLEN JOO, TIBA PARSA, CRAIG BURSON, *and* TIM REYNOLDS, *individually and on behalf of all others similarly situated*,

Plaintiffs,

*– against –*

TASKUS, INC. *and* DOES 1-10,

Defendants.

**OPINION & ORDER**

25-cv-04409 (ER)

RAMOS, D.J.:

Nelson Estrada, Allen Joo, Tiba Parsa, Craig Burson, and Tim Reynolds ("Plaintiffs") initiated this putative class action against TaskUs for failure to safeguard their personal identifiable information ("PII") due to a data breach. Doc. 36.

Before the Court is TaskUs' motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Factual Background

#### *1. The Parties*

TaskUs is a business process outsourcing company that provided offshore customer support services to Coinbase, Inc., an American cryptocurrency exchange that allows investors to buy, sell, and transfer over 250 types of cryptocurrencies. ¶¶ 1, 4.[1] Plaintiffs are customers of Coinbase and provided Coinbase their PII, including their names, addresses, phone numbers, email addresses, social security numbers, bank account numbers, bank account identifiers, government-identification images, and

[1] Unless otherwise noted, citations to "¶ _" refer to the amended complaint, Doc. 36.

account data. ¶¶ 1, 4, 18–22, 110. Employees of TaskUs were given access to the PII to provide customer support services to Coinbase customers. ¶ 29. Plaintiffs do not allege that they had any direct dealings with TaskUs outside of the customer services provided. Doc. 36. They also do not allege that they entered into any express contract with TaskUs. *Id*.

TaskUs adopted policies to protect the PII of Coinbase customers. ¶ 31. For example, employees were prohibited from using their cell phones and other personal electronic devices on premises where they fielded customer service calls for Coinbase customers. *Id*. However, this prohibition was allegedly largely not enforced. *Id*. In addition, TaskUs failed to adopt certain industry-standard security practices, such as key logging[2], which would allow it to supervise employees who download or view customers' PII in large batches. ¶ 32.

*2. The Instant Data Breach*

Criminal actors started to recruit TaskUs employees to steal the PII of Coinbase customers in 2024. ¶ 33. Those actors caused TaskUs employees to use their cell phones to take pictures of the PII displayed on TaskUs' computers. ¶ 34. They were paid $200 per picture and generated half-a-million dollars, while the average salary for an entry level TaskUs employee at their location ranged from approximately $4,000 to $6,000 a year. ¶¶ 28, 36. Two TaskUs employees directly communicated with the criminal actors and managed small circles of other employees who participated in the theft. ¶¶ 35, 37. Except for the two employee organizers, the other employee participants were disconnected from one another. ¶ 35.

After receiving the PII, the criminal actors bombarded Coinbase customers with calls and texts. ¶ 49. Impersonating Coinbase employees, they claimed that fraudulent activities were detected on these customers' accounts. ¶¶ 45–47. To make their claims

---

[2] Keylogging is the practice of tracking and recording activities on an electronic device.

more credible, they identified the customers by name, phone number, email address, and recent Coinbase transaction history—information that was presumably only known to Coinbase. *Id*. Then they asked the customer to create a new Coinbase digital wallet, transfer cryptocurrencies to that wallet, and provide them with information about that new wallet. *Id*. In this manner, they gained control of the new wallet. *Id*. In total, they stole over $400 million from Coinbase customers. ¶ 44.

*3. Investigation*

For months leading up to TaskUs' discovery of the data breach, Coinbase had been receiving an increasing number of complaints about imposters contacting customers. ¶ 54. Reports published by the Federal Trade Commission ("FTC") also showed an increasing number of "business imposter" complaints directed towards Coinbase. ¶ 55. But TaskUs did not discover the data breach until January 2025. ¶ 37. On January 1, 2025, TaskUs identified an employee who brought a personal electronic device to the Indore, India facility, the premises where customer services for Coinbase was performed. *Id*. It secured her device and identified hundreds of pictures of the PII of Coinbase customers. *Id*. It also found encrypted communications between her and criminal actors discussing the theft of the PII. *Id*. Thereafter, TaskUs commenced an investigation of the PII theft. ¶ 38. The TaskUs investigation also identified the other employee who had direct communication with the criminal actors, but it could not identify all the individuals involved in the theft due to its pervasiveness. ¶¶ 38–39. The scheme extended to the supervisory levels of TaskUs, including team leaders and operations managers. ¶ 39.

In January 2025, TaskUs terminated 300 employees at the Indore facility, citing allegations of fraud. ¶¶ 39–40. However, it did not disclose the breach to Coinbase customers at this time. ¶ 41. In February 2025, TaskUs terminated all the human resources team members who investigated the data breach and refused to provide information substantiating the basis for their terminations. ¶ 42. Approximately three

months later, TaskUs was taken private by Blackstone, an asset management company, at a valuation of $1.62 billion. ¶¶ 43, 50.

On May 14, 2025, Coinbase publicly disclosed the data breach. ¶ 50. According to Coinbase, the criminal actors demanded $20 million to cover the attack but it refused to pay the ransom. *Id*. Coinbase also began sending data breach notifications to affected customers, including Plaintiffs, in early May 2025. ¶ 52. It claimed that approximately 70,000 Coinbase customers were affected by the data breach, but this allegedly is an underestimation because many customers who received communications from the criminal actors did not receive the data breach notification from Coinbase. ¶¶ 50, 56.

*4. TaskUs' History of Data Breaches*

The Coinbase data breach is not the first data breach caused by TaskUs employees. ¶ 70. In 2022, a group of cryptocurrency investors initiated a class action against TaskUs for a data breach. ¶ 71; *Forsberg v. Shopify, Inc. et al*., C.A. No. 22-cv-346 (D. Del. Apr. 1, 2022). As a result of the data breach, these investors lost money in phishing attacks and faced threats of physical violence and blackmail if they did not transfer crypto-assets to the perpetrators involved. *Id*. As a result, in its 2024 Form 10-K, TaskUs identified data breaches as a risk of its business. *Id*. It also acknowledged that its employees have engaged and could engage in criminal, fraudulent, or other conduct related to clients' sensitive data. ¶ 70. The Form 10-K also states that TaskUs "strives to comply with applicable industry [] standards . . . relating to privacy and information security and are subject to the terms of [its] own privacy policies and privacy-related information obligations to third parties." ¶ 84.

**B. Procedural History**

On May 27, 2025, Plaintiffs initiated the instant action against TaskUs. Doc. 1. On September 2, 2025, TaskUs moved to dismiss the complaint. Doc. 30. On September 16, 2025, instead of filing an opposition to the motion, Plaintiffs filed an amended complaint against TaskUs and Does 1–10, alleging negligence (Count 1); negligent hiring

or supervision (Count 2); conversion (Count 3); fraud (Count 4); breach of implied contract (Count 5); unjust enrichment (Count 6); a claim based on the Federal Declaratory Judgment Act (Count 7); violations of the unfair and deceptive practices laws (Count 8); and a violation of the California Consumer Privacy Act ("CCPA") (Count 9). Doc. 36.

TaskUs moved to dismiss the amended complaint on October 30, 2025. Doc. 46. In summary, TaskUs argues that: (1) it did not owe Plaintiffs a duty to safeguard their PII; (2) its employees did not take dominion over the stolen cryptocurrency, and even if they did, their conduct should not be imputed to TaskUs; (3) it did not have actual knowledge of the cryptocurrency theft; (4) it did not enter into any implied contract with Plaintiffs; (5) Plaintiffs did not confer on it any direct benefit in exchange for data protection, and the unjust enrichment claim is duplicative of the tort and contract claims; (6) the Declaratory Judgment Act does not create an independent cause of action; (7) it was not a business pursuant to the CCPA; and (8) Plaintiffs fail to meet the notice pleading standard when alleging their unfair competition claims, and fail to state the unlawful prong of the claims. Doc. 47.

Meanwhile, TaskUs is a defendant in a multi-district litigation against Coinbase initiated by a group of Coinbase customers. *In Re Coinbase Customer Data Security Breach Litigation*, No. 25-md-03153 (S.D.N.Y. Jan. 15, 2026).

## II. LEGAL STANDARD

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is

plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

## III. DISCUSSION

### A. Negligence and Negligent Hiring

"To establish a prima facie case of negligence, a plaintiff must demonstrate [] a duty owed by the defendant to the plaintiff." *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985). The parties dispute whether TaskUs owed Plaintiffs a duty to exercise reasonable care safeguarding their PII. Doc. 47 at 8; Doc. 57 at 13. The Court concludes that such a duty existed.

Courts traditionally determine whether a duty is owed by balancing factors, "including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new

channels of liability." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2010) (internal citation and quotation marks omitted). New York courts are cautious in extending liability to defendants for their failure to control the conduct of others and thus usually limit such liability to situations in which "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *In re September 11 Litigation*, 802 F.3d 314, 345 (2d Cir. 2015); *see also id*. This cautious approach arises from courts' concerns about potentially limitless liability and the unfairness of imposing liability for the acts of another. *Hamilton*, 96 N.Y.2d at 233; *De Leon v. DraftKings, Inc.*, No. 25-cv-644 (DLC), 2025 WL 3551627, at *10 (S.D.N.Y. Dec. 11, 2025). Courts must tailor any extension of the scope of duty to accurately reflect the extent that its social benefits outweigh its costs. *Hamilton*, 96 N.Y.2d at 232; *Toretto v. Donnelley Financial Solutions, Inc.*, 583 F. Supp. 3d 570, 593 (S.D.N.Y. 2022).

Here, Plaintiffs plausibly allege that TaskUs owed them a duty to exercise reasonable care safeguarding their PII. New York courts "assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost." *Davis v. South Nassau Communities Hospital*, 26 N.Y.3d 563, 572 (2015). At this juncture, Plaintiffs have plausibly alleged that TaskUs is in the best position to protect the information on its computer systems and supervise its employees to prevent misconduct. *Toretto*, 583 F. Supp. 3d at 594 (holding that the defendant was in the best position to protect information on its own servers from data breach); *see also In re GE/CBPS Data Breach Litigation*, No. 20-cv-2903 (KPF), 2021 WL 3406374, at *8 (S.D.N.Y. Aug. 4, 2021) (holding that the defendant, a third-party data processor, owed a duty to protect the plaintiffs' PII because the plaintiffs were required by their employer to submit the PII and the defendant had exclusive capacity to protect the PII stored in their computer system).

Moreover, TaskUs was aware of the risk of data breaches. *See In re Warner Music Group Data Breach*, No. 20-cv-7473 (PGG), 2025 WL 2531832, at *12 (S.D.N.Y.

Sept. 3, 2025) (holding that the defendant owed a duty to protect the plaintiffs' PII in part because the defendant knew it was a target for cyberattack given the history of its data security failures and the fact that it operated an online commerce platform); *see also Toretto*, 583 F. Supp. 3d at 594 (holding that the defendant owed a duty to protect the plaintiffs' PII in part because the defendant knew it was the target of cyberattacks and understood the importance of data security to its business). TaskUs was sued for a similar breach in 2022, and it acknowledged past employee fraudulent conduct in connection with customer PII and identified it as a continuing risk in its 2024 Form 10-K. ¶¶ 70–71.

In addition, imposing the duty on TaskUs will not expose it to unlimited liability or proliferation of claims filed in court. *See Hamilton*, 96 N.Y.2d 232. TaskUs' liability will be limited to claims brought by individuals whose PII was compromised. *See Toretto*, 583 F. Supp. 3d at 594; *see also Rand v. Travelers Indemnity Co.*, 637 F. Supp. 3d 55, 70 (S.D.N.Y. 2022) (finding that imposing the duty to safeguard plaintiffs' PII would only subject the defendant, a third-party custodian of the PII, to limited liability).

TaskUs argues that it did not owe Plaintiffs any common law duty to protect their PII because: (1) Plaintiffs had no relationship with TaskUs; and (2) TaskUs did not have a duty to safeguard Plaintiffs' PII from third-party criminal theft. Doc. 47 at 8–9. Indeed, the New York Court of Appeals has held that a defendant generally has no duty to control the conduct of third persons to prevent them from harming others, but a duty may arise "where there is a relationship either between [a] defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between [a] defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others." *Hamilton*, 96 N.Y.2d at 233. The rationale behind the special relationship carveout is that the relationship "places the defendant in the best position to protect against the risk of harm" and "the specter of limitless liability is not present." *Id*. Here, imposing the duty on TaskUs is consistent with this rationale. *See Rand*, 637 F. Supp. 3d

at 70 (holding that the defendant, who scraped plaintiffs' information from a department of motor vehicles website to provide car insurance quotes through its own website, owed a duty to protect plaintiffs' information from third-party cyberattack on its website because it was in the best position to protect against the risk of harm without the concern of limitless liability); *see also In re USAA Data Security Litigation*, 621 F. Supp. 3d 454, 470 (S.D.N.Y. 2022) (similar).[3]

TaskUs also argues that the Court should follow *Hammond v. The Bank of New York Mellon Corp.*, No. 08-cv-6060 (RMB) (RLE), 2010 WL 2643307 (S.D.N.Y. June 25, 2010). In *Hammond*, the plaintiffs did not have any direct relationship with the defendant bank. They turned over their PII to institutional clients of the bank, such as the Walt Disney Company and the American Water Company, who then forwarded the data to the bank. The bank stored the PII on tapes but lost some of them. The court held that the bank did not owe a duty to protect plaintiffs' PII on the tapes because: (1) the plaintiffs had no direct dealings with the bank; and (2) banks generally owe no duty of care to their non-customers. *Hammond*, 2010 WL 2643307 at *2, *9.

*Hammond* is distinguishable. The *Hammond* decision relied in part on the fact that the defendant is a bank, and it is well established pursuant to New York law that banks generally do not owe non-customers a duty of care. *Id.*; *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 281 (E.D.N.Y. 2010). But TaskUs is not a bank. Imposing the duty on TaskUs would not expose it to as broad a liability as a bank would be exposed to if the bank owed a duty to non-customers. *Cf. Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286–87 (2d Cir. 2006) ("[B]anks do not owe non-customers a duty to

---

[3] In addition to *Hamilton*, TaskUs cites three cases to support its position that it should not be held liable for the criminal acts of third-parties. Doc. 47 at 9. The first case, *Donnelly v. Elling*, 85 A.D.3d 847 (2d Dep't 2011) involved a personal injury action, which is substantively different from the instant case. The other two cases, *In re Supervalu, Inc.*, 925 F.3d 955 (8th Cir. 2019) and *Quinalty v. FocusIT LLC*, No. CV-23-00207 (PHX) (JJT), 2024 WL 342454 (D. Ariz. Jan. 30, 2024), did address the duty to safeguard PII, but they did not apply New York law. The weight of authority applying New York law under similar circumstances holds the opposite. *See e.g.*, *Rand*, 637 F. Supp. 3d at 70; *In re USAA*, 621 F. Supp. 3d at 470.

protect them from the intentional torts of their customers . . . . With billions of banking transactions occurring in New York alone, this would be the equivalent of making New York banks liable to the world's banking public."). In addition, as the *Toretto* court held, *Hammond* might not be the right case to follow today because it was decided sixteen years ago in 2010 and data breach jurisprudence has developed significantly since then. *Toretto*, 583 F. Supp. 3d at 594–95. Therefore, TaskUs' motion to dismiss the negligence claims is denied.

**B. Conversion**

Plaintiffs allege conversion based on the doctrine of *respondeat superior*. ¶¶ 145–52. To state a claim for conversion, a plaintiff must show that: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Constrafor, Inc. v. Federal Deposit Insurance Corp.*, No. 24-cv-4402 (JGLC), 2025 WL 2636588, at *4 (S.D.N.Y. Sept. 12, 2025).

Here, the Court determines that Plaintiffs fail to plausibly allege that TaskUs employees exercised dominion over the property that was allegedly converted. Plaintiffs identify their cryptocurrency as the property subject to conversion. ¶¶ 145–52. Although Plaintiffs allege that TaskUs employees extracted data necessary for the criminal actors to exercise wrongful dominion, they do not allege that at any point the employees exercised dominion over Plaintiffs' cryptocurrency. ¶ 148. Plaintiffs argue that TaskUs employees received compensation paid out of the cryptocurrency stolen from Plaintiffs. Doc. 52 at 18. That may be, but New York law requires exercising dominion over the specific property converted. *Constrafor*, 2025 WL 2636588, at *4. Proceeds realized from the sale of the cryptocurrency are not the same as the cryptocurrency itself. *Cf. Castaldi v. 39 Winfield Associates*, 30 A.D.3d 458, 459 (2nd Dep't 2006) (holding that the plaintiff failed to show that it had ownership over the proceeds from the sale of the premises when

it only alleged that it was entitled to payment for the renovation work it performed for the premises).

In their memorandum in opposition, Plaintiffs also ask the Court to "reasonably infer" that TaskUs employees not only stole the PII but also participated in subsequent impersonation of Coinbase personnel and "stole" Plaintiffs' cryptocurrencies. Doc. 52 at 18. They allege that it is "telling" that the criminal actors posed as Coinbase's customer service representatives, the very job that TaskUs employees undertook. *Id*. At the motion to dismiss stage, courts draw reasonable inferences in the plaintiff's favor when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct. *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013). However, without more, selling customers' PII is not suggestive of participation in the subsequent impersonation. The fact that the criminal actors impersonated customer service representatives also does not suggest that the real customer service representatives, TaskUs employees, engaged in the impersonation. In impersonation scams targeting customers of a company, criminals commonly pretend to be customer service representatives of the company. Moreover, Plaintiffs' own allegations weigh against such an inference. As alleged in the amended complaint, only two TaskUs employees had direct contact with the criminal actors. ¶¶ 35, 37. Therefore, the Court declines Plaintiffs' invitation to draw the inference.

In addition, even if Plaintiffs plausibly allege that TaskUs employees converted their cryptocurrencies, they fail to establish that TaskUs is vicariously liable for the conversion. An employer is liable for the tortious acts of employees only if those acts were "committed in furtherance of the employer's business and within the scope for employment." *Rivera v. State*, 34 N.Y.3d 383, 389 (2019). In determining whether an employee acted within the scope of employment for purposes of vicarious liability, the New York Court of Appeals considers, among other factors,

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated (i.e., whether it was foreseeable).

*Id*. at 390 (quoting *Riviello v Waldron*, 47 NY2d 297, 303 (1979)). An employer bears no vicarious liability where the employee committed the tort "for personal motives unrelated to the furtherance of the employer's business." *Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010); *Rivera*, 34 N.Y.3d at 389 ("if an employee for purposes of their own departs from the line of . . . duty so that for the time being their acts constitute an abandonment of . . . service, the employer is not liable"). Plaintiffs fail to plausibly allege that acting in concert with external criminal actors to convert Plaintiffs' cryptocurrencies was within the scope of the employment of TaskUs' employees. *See Robinson v. United States*, No. 23-cv-5444 (DLI) (TAM), 2024 WL 4333859, at *4 (E.D.N.Y. Sept. 27, 2024) (holding that even if the Department of Justice ("DOJ") employee obtained and leaked the video of a cooperator using DOJ's resources, she acted outside of the scope of her employment because the employee was motivated by personal interest and the DOJ did not benefit from the leaking); *see also Judith M. v. Sisters of Charity Hospital*, 93 N.Y.2d 932, 933 (1999) (holding that sexually abusing a patient was not within the scope of employment of a hospital employee).

Plaintiffs point to two cases from the Second Department of the Appellate Division of New York Supreme Court, where the court held that an employer is liable for an employee's conduct as long as the general type of conduct is reasonably expected, even if the employee acted for personal interest unrelated to the furtherance of the employer's business. *Hatton v. Quad Realty Corp*., 100 A.D.2d 609–10 (2d Dep't 1984); *Holmes v. Gary Goldberg & Co.*, 40 A.D.3d 1033, 1034–35 (2d Dep't 2007). Both *Hatton* and *Holmes* involved employees gaining access to clients' funds through their

employment and converting the funds to their own use. *Id*. The employers in both cases were found liable for conversion because "it is certainly foreseeable that an agent entrusted with significant sums of money might convert such funds to his own use." *Hatton*, 100 A.D.2d at 610; *Holmes*, 40 A.D.3d at 1034–35. However, the case cited by *Hatton* and *Holmes* in holding that general expectation alone is sufficient to hold an employer liable, *Riviello*, does not support this holding. In *Riviello*, the employee of a pub, who served as the cook and waiter, accidentally hurt a patron when socializing with the patron during his shift. *Riviello*, 47 NY2d at 301–02. The court analyzed each of the factors enumerated above to determine whether the act was within the scope of the employment. *Id*. at 303–05. When it analyzed whether the act of the employee departed from the normal methods of his performance and whether the specific act of the employee was foreseeable, it held that an employer need not have foreseen the precise act of the employee as long as the general type of conduct may have been reasonably expected. *Id*. at 304. It did not hold that general expectation alone is sufficient to hold an employer liable even if the employee acted for personal interest. In fact, the court determined that socializing with the patrons benefited the business and was a concomitant of the employment. *Id*. at 303. The same cannot be said here. Therefore, Plaintiffs fail to state a conversion claim against TaskUs.

**C. Aiding and Abetting a Fraud**

Plaintiffs allege that TaskUs aided and abetted the fraudulent scheme of the criminal actors by: (1) hiring, retaining, and failing to supervise employees with known risks of misconduct; (2) failing to enforce its own device restrictions and monitoring policies; and (3) ignoring red flags of widespread theft within its operations and then taking steps to cover up its knowledge of the data breach. ¶ 157.

To allege fraud under an aiding and abetting theory, a plaintiff must show: "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner*,

459 F.3d at 292. A plaintiff must plausibly establish that the alleged aider and abettor had actual, instead of constructive knowledge of the primary wrong. *Id*. This actual knowledge requirement is different from scienter required to allege the underlying fraud, where facts constituting strong circumstantial evidence of recklessness or conscious misbehavior are sufficient.[4] *J.P. Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 253 n. 4 (S.D.N.Y. 2005); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010).

The Court finds that Plaintiffs fail to plausibly allege that TaskUs had actual knowledge of the fraud, the cryptocurrency theft, when it allegedly provided assistance to the fraud. Plaintiffs argue that they sufficiently establish actual acknowledge because they allege TaskUs "presumably" received complaints of cryptocurrency theft during customer service calls. Doc. 52 at 21. In addition, according to Plaintiffs, TaskUs "must have known" about the fraud because the FTC had reported incidents of criminal actors impersonating Coinbase's customer support agents months before Coinbase publicly disclosed the data breach. *Id*. However, the amended complaint does not allege any facts showing that TaskUs actually assisted customers with claims of cryptocurrency theft, or that it was aware of the FTC reports. Doc. 36. Even assuming, *arguendo*, the truth of

---

[4] Plaintiffs acknowledge that actual knowledge is required for an aiding and abetting fraud claim pursuant to New York law. Doc. 52 at 20. But they argue that they are not required to plead actual knowledge to survive motion to dismiss, and that facts showing motive or recklessness are sufficient. *Id*. They cite *Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 314 (S.D.N.Y. 2009) to support their position. *Id*. The Court acknowledges that *Adelphia Recovery* held that to state an aiding and abetting fraud claim, a plaintiff does not need to plead actual knowledge. *Adelphia*, 624 F. Supp. 2d at 314. But the Court respectfully disagrees. *Adelphia* cited three cases to support this holding: *Lerner*, 459 F.3d at 290–91; *M–101, LLC v. iN Demand L.L.C.,* No. 06-cv-12938, 2007 WL 4258191, at *2 (S.D.N.Y. Dec. 03, 2007); and *Oh v. Imagemark, Inc.,* No. 06-cv-10187, 2007 WL 2962381, at *3 (S.D.N.Y. Oct. 10, 2007). *M–101* and *Oh* both addressed fraud claims, not aiding and abetting claims. *M–101*, 2007 WL 4258191, at *2; *Oh*, 2007 WL 2962381, at *3. In *Lerner*, the Second Circuit clearly held that actual knowledge is required for aiding and abetting claims pursuant to New York law and dismissed the aiding and abetting fraud claim because the complaint only alleged actual knowledge of fraud in a conclusory manner. *Lerner*, 459 F.3d at 293. *Lerner* also cited a footnote in *J.P. Morgan Chase Bank*, which explicitly held that actual knowledge, rather than recklessness, is the controlling legal standard for an aiding and abetting a fraud claim pursuant to New York law, even at motion to dismiss stage. *J.P. Morgan Chase Bank,* 406 F.Supp.2d at 253 n. 4.

these assertions, TaskUs' awareness of fraud does not reasonably give rise to an inference of its knowledge of its employees' involvement in the fraud. The notifications about fraudulent activities related to Coinbase are at best "red flags," and pursuant to New York law, ignorance of red flags of fraud cannot establish actual knowledge of the alleged aider and abettor. *Rosner v. Bank of China*, No. 06-cv-13562, 2008 WL 5416380, at *10 (S.D.N.Y. Dec. 18, 2008), *aff'd,* 349 F. App'x 637 (2d Cir. 2009); *see Lerner*, 459 F.3d at 292–93 (holding that plaintiffs failed to plead with particularity that the bank defendant had knowledge of the lawyer's looting of client funds from fiduciary accounts although the bank knew the lawyer overdrew these accounts).

Plaintiffs also argue that it is "inconceivable" that TaskUs could not have known of such a widespread fraud taking place over a prolonged period of time. Doc. 52 at 21. The Court similarly finds this argument insufficient. Having reasons to suspect the fraud does not equate to actual knowledge of the fraud. *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 413 (S.D.N.Y. 2021) (holding that suspicious circumstances which might have induced a prudent businessman to investigate does not give rise to an inference of actual knowledge); *Cf. Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01-cv-2272 (GBD), 2004 WL 35439, at *3 (S.D.N.Y. Jan. 6, 2004) (finding that the plaintiff even failed to allege inference of scienter when it only alleged the defendants' knowledge of pervasive fraud in the industry).

Plaintiffs further argue that TaskUs had knowledge of the fraud because it "took steps to cover its knowledge of the [d]ata [b]reach" and "knew that its employees were engaged in misconduct."[5] Doc. 52 at 21. But allegations regarding TaskUs' alleged misconduct *after* it learned about the fraud do not give rise to a reasonable inference that

[5] Plaintiffs cite *Rosner*, 2008 WL 5416380, at *12 to support this position and argue that *Rosner* held that a defendant may be held liable for fraud if it helps conceal the fraud. Doc. 52 at 21. But *Rosner* does not bolster Plaintiffs' argument. *Rosner* held that affirmative assistance in concealment can constitute substantial assistance required for an aiding and abetting claim, but it did not address whether concealment can establish actual acknowledge. *Rosner*, 2008 WL 5416380, at *12.

TaskUs knew about the fraud beforehand. Accordingly, TaskUs' motion to dismiss the aiding and abetting fraud claim is granted.

**D. Breach of Implied Contract**

Plaintiffs argue that they provided TaskUs with their PII and paid money to TaskUs through Coinbase in exchange for TaskUs' customer services, protection of their PII, and timely notice in the event of a data breach. ¶¶ 160–67. They argue that TaskUs breached an implied contract between them by failing to safeguard Plaintiffs' PII and provide them with timely and accurate notice of the data breach. *Id*.

"Under New York law, a contract implied in fact may result as an inference from the facts and circumstances of the case, though not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct." *Sackin v. TransPerfect Global, Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) (quoting *Leibowitz v. Cornell University*, 584 F.3d 487, 506–07 (2d Cir. 2009)). An implied contract requires consideration, mutual assent, legal capacity and legal subject matter, just like an express contract. *Id*. Mutual assent requires a meeting of the minds of the parties on all essential terms of the contract. *Prince of Peace Enterprises, Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011). To form a binding contract, assent has to be objectively manifested. *Wu v. Uber Technologies, Inc*., 43 N.Y.3d 288, 299 (2024).

In the data breach context, courts often find an implied contract where the defendant is bound to safeguard the plaintiff's PII, if the defendant promises data security procedures in its policy documents. *In re GE/CBPS Data Breach Litigation*, 2021 WL 3406374, at *2, *11–12 (finding an implied contract when the defendant described its data security procedures in details and expressed commitment to data security on its website and in its publicly distributed policy documents); *In re Unite Here Data Security Incident Litigation*, 740 F. Supp. 3d 364, 384 (S.D.N.Y. 2024) (finding an implied contract when the defendant promised the plaintiffs that it complied with industry

standards and written privacy policies). Some courts have also found an implied contract based on the fact that a defendant requires the PII as a condition of employment or services and as a result, the plaintiff entrusts the defendant with their PII. *See Sackin*, 278 F. Supp. 3d at 750 (finding that the fact that the defendant required and obtained plaintiffs' PII as part of the employment relationship evinced an implicit promise to safeguard the PII); *Troy v. American Bar Association*, No. 23-cv-03053 (NGG)(VMS), 2024 WL 1886753, at *4 (E.D.N.Y. Apr. 30, 2024) (finding requiring plaintiffs to provide their PII when making purchases with the defendant was sufficient to establish the existence of an implied contract based on industry custom). Courts have held that it is difficult to imagine how, in our age of data and identity theft, the mandatory receipt of PII would not imply the recipient's assent to sufficiently protect the information. *Sackin*, 278 F. Supp. 3d at 751 (quoting *Castillo v. Seagate Technology, LLC*, No. 16-cv-1958, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016)).

Here, the Court finds no implied contract between the parties for lack of mutual assent because of the lack of a direct relationship between them. Plaintiffs argue that mutual assent was formed through TaskUs' Form 10-K. Doc. 52 at 23. In the form, TaskUs represented that it "strives to comply with appliable industry [] standards . . . relating to privacy and information security and are subject to the terms of [its] own privacy policies and privacy-related information obligations to third parties." *Id*. However, "[a] party's conduct indicates assent when he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Leibowitz*, 584 F.3d at 507. These statements in a Form 10-K should not be seen as a promise to Plaintiffs because they were directed to investors, not Plaintiffs. The only direct interaction between TaskUs and Plaintiffs that they identify is when TaskUs fielded customer service calls for Coinbase. Doc. 52 at 22. Plaintiffs do not even allege that they were aware of the existence of TaskUs before the data breach. Doc. 36.

Without more, Plaintiffs fail to show that TaskUs had reason to expect them to read its Form 10-K.

The present case is different from cases where courts found an implied contract based on express promises of data security. In those cases, the promises are found in places where the intended counterparty would be reasonably expected to see or rely on them. *See In re GE/CBPS Data Breach Litigation*, 2021 WL 3406374, at *11–12 (finding an implied contract because the employee plaintiffs reasonably believed that the defendant would protect their PII based on the representations in its data privacy policies and "Employee Data Protection Standards and Commitment to the Protection of Personal Information documents"); *see also Wallace v. Health Quest System, Inc.*, No. 20-cv-545 (VB), 2021 WL 1109727, at *10 (S.D.N.Y. Mar. 23, 2021) (finding that the defendant intended to be bound by its obligation to safeguard plaintiffs' PII because defendant posted notices of privacy practices on its website).

In addition, Plaintiffs fail to plausibly allege that any implied contract was formed based on the alleged mandatory receipt of PII. They allege that TaskUs required them to "provide[] or authorize the transfer of their PII in order for TaskUs to provide services." ¶ 161. They also allege that they handed over their PII with the expectation that TaskUs or anyone in TaskUs' position would safeguard the data. ¶ 110–11. However, they fail to plausibly allege that they specifically dealt with TaskUs when they formed the expectation. Unlike the cases above where courts found implied contract based on the mandatory receipt of PII, Plaintiffs do not allege that they directly turned over their PII to TaskUs or were even aware of its existence when they turned over their PII. Although Plaintiffs argue that they "likely spoke with" TaskUs employees when they called Coinbase's customer service help line, they do not allege that these communications occurred before they turned over their PII or that they were aware that it was TaskUs, rather than Coinbase employees, that fielded the calls. Doc. 52 at 22. As a result, there was no meeting of the minds on an essential term of the alleged implied contract—that

TaskUs, rather than anyone else, will safeguard Plaintiffs' PII. *See In re Arthur J. Gallagher Data Breach Litigation*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022) (holding that the plaintiffs could not have reached a meeting of the minds with the defendants, who were a benefits company and a third-party administrator used by plaintiffs' employers, because the plaintiffs had no direct dealings with defendants and were unaware of their existence until receiving the notice of the data breach); *Hammond*, 2010 WL 2643307, at *11 (holding that there was no meeting of the minds between plaintiffs and the defendant, the bank used by the companies to which Plaintiffs provided their PII, because they had no direct dealings); *In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation*, 834 F. Supp. 2d 566, 582–83 (S.D. Tex. 2011) (similar), *reversed on another ground sub nom. Lone Star National Bank, N.A. v. Heartland Payment Systems, Inc.*, 729 F.3d 421 (5th Cir. 2013).

Plaintiffs argue that "*Hammond* is no longer good law" because *Toretto* held that "data breach jurisprudence has developed significantly since *Hammond* was issued in 2010." Doc. 52 at 16, 22. But *Toretto* made this comment in the context of negligence claims and held that "since [2010], numerous courts . . . have denied motions to dismiss negligence claims in data breach cases." *Toretto*, 583 F. Supp. 3d at 594–95. Moreover, Plaintiffs fail to identify any case departing from this holding in *Hammond*. Therefore, Plaintiffs fail to plausibly allege mutual assent. The breach of implied contract claim is dismissed. *See Prince of Peace Enterprises*, 760 F. Supp. 2d at 397.

**E. Unjust Enrichment**

Plaintiffs also allege an unjust enrichment claim in the alternative. ¶ 169. They allege that they conferred benefits upon TaskUs by paying Coinbase, who in turn paid TaskUs for customer support services. ¶ 170. Moreover, Plaintiffs allege that they transferred their cryptocurrencies to the criminal actors who bribed TaskUs employees for stealing Plaintiffs' PII. ¶ 171. TaskUs benefited from the bribes because the payment remunerated its employees, reduced attrition rates, and compensated for low salaries. *Id*.

To state a claim for unjust enrichment, a plaintiff must allege that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). TaskUs argues that Plaintiffs fail to allege that they conferred any direct benefit on it or that any benefit was conferred in exchange for data protection. Doc. 47 at 12; Doc. 57 at 10. In response, Plaintiffs argue that they conferred benefits on TaskUs through fees paid to Coinbase and bribes paid to TaskUs employees. Doc. 52 at 23. They also argue that customers of cryptocurrency financial services firms naturally expect and count on a portion of firm's revenue to be used to safeguard customer's PII. *Id*. at 24. The Court finds TaskUs' arguments unavailing.

Pursuant to New York law, for an unjust enrichment claim, "it does not matter if the benefit is directly or indirectly conveyed." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40–41 (1st Dep't 2004) (holding that indirect purchaser of Microsoft's products stated an unjust enrichment claim against Microsoft although the purchaser only indirectly bestowed a benefit upon Microsoft). A direct relationship between the plaintiff and defendant is not required. New York law only requires that the relationship not be "too attenuated."[6] *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

Meanwhile, Plaintiffs plausibly allege that a portion of their payments went toward data protection. They allege that a portion of their payments to Coinbase was used to compensate TaskUs for its services and they suffered damages in an amount equal to the difference in value between the services they paid for and the services they received. ¶ 170. They paid for customer services with reasonable data privacy and security practices but did not receive such protection. ¶ 173. Courts in this district

[6] TaskUs does not argue that their relationship with Plaintiffs is too attenuated to support an unjust enrichment claim. Docs. 47, 57.

routinely find that a portion of the benefit conferred by a plaintiff goes toward data protection when the defendant receives plaintiffs' sensitive data along with monetary benefit. *See e.g.*, *Wallace*, 2021 WL 1109727, at *11 (finding that plaintiffs, who were patients of defendant's healthcare provider network, plausibly stated that defendant was unjustly enriched because it was paid by plaintiffs for its services but failed to safeguard their PII); *Rudolph v. Hudson's Bay Co.*, No. 18-cv-8472 (PKC), 2019 WL 2023713, at *12 (S.D.N.Y. May 7, 2019) (finding that plaintiff, a customer of defendants' department store, plausibly stated an unjust enrichment claim when she alleged that defendants benefited from her purchase with her debit card and wrongfully retained the benefit despite failing to secure her data).

The case cited by TaskUs, *In re Supervalu, Inc.*, 925 F.3d 955 (8th Cir. 2019), is not binding on this Court and inapposite. In *Supervalu*, plaintiffs paid for groceries with their credit or debit cards and their financial information was stolen in a data breach. *Supervalu*, 925 F.3d at 960. The Eighth Circuit found no viable unjust enrichment claim against the grocery store, holding that no benefit was conferred in exchange for protection of plaintiffs' card information because plaintiffs paid the same amount as customers who paid cash for their groceries and thus did not pay a premium for data security. *Id*. at 966. Here, TaskUs does not allege that there were any Coinbase customers who did not turn over their PII but paid the same amount as Plaintiffs.

TaskUs further argues that the unjust enrichment claim should be dismissed as duplicative. The Court disagrees. "[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). "Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id*. In *Corsello*, the plaintiffs alleged that the defendant trespassed on or took

their property and deceived them into thinking they were not entitled to compensation. *Id*. at 791. The Court of Appeals dismissed the unjust enrichment claim that relied on the same set of facts as plaintiffs' trespass, inverse condemnation, and deceptive trade practice claims because to the extent that these other claims succeed, the unjust enrichment claim is duplicative and if these claims are defective, an unjust enrichment claim cannot remedy the defects. *Id*.

The present case is different from *Corsello* in that the unjust enrichment claim may remedy the defects of its negligence claims. For example, Plaintiffs' negligence claims require showing that TaskUs had a duty of care to safeguard Plaintiffs' PII. ¶ 130. As discussed above, the establishment of duty depends on a series of factors, including whether TaskUs is in the best position to safeguard the PII. It is possible for a trier of fact to find that TaskUs was not negligent but unjustly retained the portion of payment that Plaintiffs reasonably expected to be used to safeguard their PII.[7] *See Corsello*, 18 N.Y.3d at 790–91; *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 116 (S.D.N.Y. 2021) ("if a plaintiff can establish an unjust enrichment claim where his tort or contract claims fail, then, under *Corsello*, the unjust enrichment claim is not duplicative of these other claims"); *Del Rosario v. Sazerac Co., Inc.*, No. 23-cv-1060 (AS), 2023 WL 6318083, at *3 (S.D.N.Y. Sept. 28, 2023) (finding the unjust enrichment claim duplicative because plaintiff did not establish how she could fail to prove her other claims and yet still prove

---

[7] TaskUs cites to *Toretto* and argues that Plaintiffs' unjust enrichment claim should be dismissed as duplicative because it is premised on the same wrongful conduct as their negligence claims. Doc. 57 at 11; *Toretto*, 583 F. Supp. 3d at 601–602. *Toretto* relied on *Trainum v. Rockwell Collins, Inc.*, No. 16-cv-7005, 2017 WL 2377988, at *20 (S.D.N.Y. May 31, 2017), which stated that "[w]here, as here, the wrongful conduct alleged with regard to unjust enrichment and tort claims is the very same, courts have dismissed unjust enrichment claims as duplicative." However, *Trainum* and the case it cited did not dismiss the unjust enrichment claim only because it was premised on the same wrongful conduct as other tort claims. *Trainum*, 2017 WL 2377988, at *20; *Gordon v. Hain Celestial Group, Inc.*, No. 16-cv-6526 (KBF), 2017 WL 213815, at *7 (S.D.N.Y. Jan. 18, 2017). Both cases engaged in claim-specific inquiries as this Court has done and held that dismissal was warranted because the unjust enrichment claim would fail if other claims fail. *Id*.

her unjust enrichment claim). Therefore, the unjust enrichment claim will not be dismissed as duplicative at this stage.

**F. Declaratory and Injunctive Relief**

Plaintiffs bring a claim under the Federal Declaratory Judgement Act. ¶¶ 176–183. TaskUs argues that this claim should be dismissed because the Declaratory Judgment Act does not create an independent cause of caution. Doc. 47 at 15 n.2. Plaintiffs clarify that they do not seek any substantive rights from this act and only bring this claim to seek declaratory and injunctive relief based on their negligence claims. Doc. 52 at 28. The Court will not dismiss this claim because Plaintiffs plausibly state the predicate for the relief sought. *See Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554 F. Supp. 3d 448, 469 (E.D.N.Y. 2021) (declining to dismiss the plaintiff's claim under the Declaratory Judgment Act because the plaintiff sufficiently stated the underlying substantive claims).

**G. Unfair Competition**

Plaintiffs allege that TaskUs violated materially identical unfair competition laws of 30 states and District of Columbia.[8] Doc. 36 at 48–50. TaskUs argues that these claims should be dismissed because Plaintiffs fail to separate various legal theories into different counts in violation of the notice pleading standard. Doc. 47 at 13. Moreover, it argues that Plaintiffs fail to state the "unlawful prong" of the violations, which requires violation of a separate law, of the unfair competition claims. *Id*. TaskUs argues that

[8] These unfair competition laws include: Ala. Code § 8-19-5; Alaska Stat. § 45.50.471; A.R.S. § 44-1522(A); A.C.A. §§ 4-88-101, et seq. ; COLO. REV. STAT. § 6-1-102; CONN. GEN. STAT. § 42-110a; DEL. CODE ANN. tit. 6, § 2511; D.C. CODE ANN. § 28-3901; Fla. Stat. §§ 501.201 ; HAW. REV. STAT. § 480-1; IDAHO CODE § 48-603; 815 ILL. COMP. STAT. 510/1 (2024); IOWA CODE § 714.16; KAN. STAT. ANN. § 50-623 (2024); LA. STAT. ANN. § 51:1401 (2024); 10 Me. Rev. Stat. §§ 1212 ; MICH. COMP. LAWS § 445.903; MINN. STAT. § 325F.69; MONT. CODE ANN. § 30-14-101; NEB. REV. STAT. § 59-1601 (2024); NEV. REV. STAT. ANN. § 598.0903 (2024); N.H. REV. STAT. ANN. § 358-A:2 (2024); N.J. REV. STAT. § 56:8-2 (2024); N.M. STAT. ANN. § 57-12-2 (2024); N.Y. GEN. BUS. LAW § 349 (2024); OKLA. STAT. tit. 15, § 751 (2024); S.C. CODE ANN. § 39-5-10; TENN. CODE ANN. § 47-18-104 (2024); VT. STAT. ANN. tit. 9, § 2453 (2024); WASH. REV. CODE § 19.86.010 (2024); WIS. STAT. § 100.18 (2024).

although Plaintiffs mention a few predicate laws, they fail to state their elements. *Id.* Defendants' arguments are unavailing.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, and it must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. Furthermore, a complaint must give the defendant fair notice of the grounds on which the plaintiffs' claims rest. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *see also* Fed. R. Civ. P. 8(a). When a plaintiff alleges violations of various state laws with identical elements, courts in this district allow the plaintiff to plead the state law violations in a single count without specifying elements of each state's law at motion to dismiss stage. *See Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc*, No. 15-cv-6549 (CM), 2018 WL 7197233, at *35 (S.D.N.Y. Dec. 26, 2018); *cf. In re Propranolol Antitrust Litigation*, 249 F. Supp. 3d 712, 729–30 (S.D.N.Y. 2017) (holding that at the pleading stage, the plaintiffs did not need to specify under which state laws the unjust enrichment claims were brought because the elements of unjust enrichment are similar in every state and defendants have made no showing that any differences in state laws are material at this early stage of litigation). Here, Plaintiffs allege that the consumer protection statutes that TaskUs allegedly violated are materially identical. ¶ 186. Although TaskUs argues that this is a "bald assertion," it does not identify any material differences among the statutes. Doc. 47 at 13. Moreover, TaskUs argues that allowing various state laws to be pleaded in a single count is not the norm. However, the cases that it cites to support its position are inapposite.[9]

[9] TaskUs cites to three cases. The first case, *Robbins v. Banner Industries, Inc.*, 285 F. Supp. 758 (S.D.N.Y. 1966), did not address whether state laws with identical elements can be pleaded together. It only held that as a general principle, a complaint should separate various legal theories in separate counts. *Id.* In addition, the court in *Robbins* did not dismiss the case for failure to meet the pleading standard. *Id.* The second case is *Moore v. Compass Group USA, Inc.*, No. 4:18-cv-01962 (SEP), 2022 WL 4598558 (E.D.

In addition, the fact that Plaintiffs do not specify the elements of predicate laws for the unlawful prong does not warrant dismissal. To plead a claim based on unlawful activities, a party must "identify some other law and state with reasonable particularity the facts supporting the statutory elements of the alleged violation." *LFG National Capital, LLC v. Gary, Williams, Finney, Lewis, Watson, & Sperando P.L.*, 874 F. Supp. 2d 108, 123 (N.D.N.Y. 2012). Relying on *LFG*, TaskUs argues that Plaintiffs fail to state the unlawful prong because they "do not attempt to state [the] elements" of the predicate laws. Doc. 47 at 14. However, *LFG* only requires *identification* of the law violated and allegation of sufficient *facts* to support the elements, instead of expressly stating the elements themselves. *See LFG National Capital, LLC*, 874 F. Supp. 2d at 123 (holding that the complaint failed to state the unlawful prong because the plaintiff could not state the business was unlawful "based on these facts"); *see also Khoury v. Maly's of California*, *Inc.*, 14 Cal. App. 4th 612, 619 (1993) (holding that the complaint failed to state with reasonably particularity the facts supporting the statutory elements of the violation because it did not include sufficient facts to describe the manner in which the practice was unlawful). Therefore, the motion to dismiss the unfair competition claims is denied.

**H. California Consumer Privacy Act**

Section 1798.150(a) of the California Consumer Privacy Act ("CCPA") provides relief for consumers whose personal information was subject to unauthorized access and exfiltration, theft, or disclosure as a result of a business' failure to implement and maintain reasonable security procedures. Cal. Civ. Code § 1798.150. Otherwise, actions

---

Mo. Sept. 30, 2022). Unlike the present case, the plaintiffs in *Moore* pleaded violations of various statutes in one count and "[did] not claim [that] each individual statute . . . has identical elements." *Moore*, 2022 WL 4598558 at *10. The last case, *Roether v. Georgia*, No. 221-cv-083, 2022 WL 3908838 (S.D. Ga. Aug. 30, 2022), involved a complaint that mixed claims based on different constitutional amendments in one count and only alleged "deceptive business practices" without specifying the statutes violated in another count. Plaintiffs in the present case identify each statute violated and claim that these statutes are materially identical to the California statute, the elements of which Plaintiffs allege in detail. ¶¶ 184–90.

against "service providers" that violated the CCPA can only be brought by the California Attorney General. *Jimenez v. OE Federal Credit Union*, No. 24-cv-02746 (JST), 2025 WL 2402137, at *7 (N.D. Cal. Aug. 19, 2025). To qualify as a "business" pursuant to the CCPA, an entity must "determine[] the purposes and means of the processing of consumers' personal information." Cal. Civ. Code § 1798.140. Meanwhile, a service provider "processes personal information on behalf of a business and that receives from or on behalf of the business consumer's personal information for a business purpose pursuant to a written contract." Cal. Civ. Code § 1798.140(ag)(1).

TaskUs argues that Plaintiffs fail to state their CCPA claim because they do not allege that TaskUs controlled the purposes and means of the processing of consumer's personal information. Doc. 47 at 14–15. It argues that it is not a "business" but a "service provider" pursuant to the CCPA.[10] *Id*.

The Court finds that Plaintiffs fail to allege that TaskUs is a business pursuant to the CCPA. Plaintiffs point to paragraph 193 of the amended complaint and argue that they "expressly allege[] that TaskUs satisfies the relevant statutory definition of business." Doc. 52 at 26. However, paragraph 193 only alleges that TaskUs is a business pursuant to the CCPA "in that it is a corporation organized for profit or financial benefit of its shareholder or other owners." ¶ 193. The amended complaint does not allege any facts giving rise to a reasonable inference that TaskUs determined the purposes and means of the processing of Plaintiffs' PII. Doc. 36. The statement in the amended complaint that TaskUs is a "business" pursuant to the CCPA is a legal conclusion that the Court need not accept as true at motion to dismiss stage. *See Sharkey v. Quarantillo*, 541

[10] TaskUs also argues that Plaintiffs fail to establish: (1) how or why TaskUs' data security procedures were inadequate or unreasonable; or (2) how or why TaskUs knew or should have known the inadequacy. Doc. 47 at 15. The Court does not address this argument because it finds that Plaintiffs fail to plausibly state that TaskUs is a business pursuant to the CCPA in the first instance.

F.3d 75, 83 (2d Cir. 2008) (holding that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation").

Plaintiffs further argue that whether TaskUs determined the purposes and means of the processing of their PII presents factual issues that cannot be resolved at this stage. Doc. 52. In fact, courts routinely analyze whether a plaintiff plausibly establishes this element on a motion to dismiss. *See In re Accellion, Inc. Data Breach Litigation*, 713 F. Supp. 3d 623, 641–43 (N.D. Cal. 2024) (dismissing the CCPA claim because the plaintiffs failed to plausibly allege that the defendant determined how the plaintiffs' PII was processed); *see also Jimenez v. OE Federal Credit Union*, No. 24-cv-02746 (JST), 2025 WL 2402137, at *7 (N.D. Cal. Aug. 19, 2025) (finding that plaintiffs plausibly alleged that the defendant determined the means of processing their PII by choosing to store that information and the method of storing that information). The amended complaint fails to allege any facts regarding TaskUs' role in determining the purposes and means of the processing of Plaintiffs' PII. Doc. 36. Therefore, Plaintiffs' CCPA claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, TaskUs' motion to dismiss the amended complaint is GRANTED in part and DENIED in part. Specifically, Plaintiffs' conversion, fraud, breach of implied contract, and CCPA claims are dismissed. Plaintiffs' negligence, negligent hiring or supervision, unjust enrichment, Federal Declaratory Judgement Act, and unfair and deceptive practice claims are not dismissed. Meanwhile, TaskUs' motion to dismiss the original complaint, Doc. 30, is denied as moot. The parties are directed to appear for a status conference on August 10, 2026, at 10:30 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007. The Clerk of Court is respectfully directed to terminate the motion, Docs. 30, 46.

It is SO ORDERED.

Dated: July 28, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.